886 F.2d 1109
 Fed. Sec. L. Rep. P 94,714
In re APPLE COMPUTER SECURITIES LITIGATION.
William H. SCHNEIDER; Charles Cohn; Jeanne Cohn; Albert
J. Whelen, Jr.; and Estelle B. Ellis;
Individuals, On Behalf of Themselves and
All Others Similarly Situated,
Plaintiffs-Appellants,
v.
John VENNARD; Delbert W. Yocam; Michael Muller; Wilfrid
J. Houde; John D. Couch; Gene P. Carter; Kenneth R.
Zerbe; Steven P. Jobs; A.C. Markkula, Jr.; John Sculley;
Individuals; and Apple Computer Incorporated, a California
corporation, Defendants-Appellees.
 No. 88-1617.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Jan. 13, 1989.
Decided Sept. 25, 1989.
 
 Frederic F. Nagel III, William S. Lerach, and Leonard B. Simon, Milberg Weiss Bershad Specthrie & Lerach, San Diego, Cal., for plaintiffs-appellants.
 M. Laurence Popofsky, Douglas M. Schwab, Paul W. Sugarman, Wayne Stephen Braveman, and Christopher M. Patti, Heller, Ehrman, White & McAuliffe, San Francisco, Cal., for defendants-appellees.
 Appeal from the United States District Court for the Northern District of California.
 Before FARRIS, BOOCHEVER and HALL, Circuit Judges.
 FARRIS, Circuit Judge:
 
 
 1
 This is an appeal from three orders which together granted summary judgment against plaintiffs on all of their claims under the Securities Exchange Act of 1934, 15 U.S.C. Sec. 78a et seq. Plaintiffs allege that Apple Computer Inc. and its top officers misled the market about the capabilities and prospects of a novel office computer and disk-drive system. They claim that they purchased Apple stock in reliance on the artificially high stock price resulting from Apple's misrepresentations, and that they suffered actionable damages when the true facts about the computer became known and Apple's stock price fell by almost 75%. The trial court granted summary judgment on the grounds that each of Apple's alleged misstatements was either immaterial or made without scienter. We affirm in part, reverse in part, and remand.
 
 BACKGROUND
 
 2
 Apple is a publicly-traded company which manufactures computers and computer peripherals. The individual defendants were officers and directors of Apple at the time of the events complained of--November 12, 1982 through September 23, 1983. During the six months immediately preceding this "class period," Apple's common stock traded in a range of between $11 and $30 per share.
 
 
 3
 In 1982, Apple was readying a computer named "Lisa" and a compatible disk-drive named "Twiggy" for commercial release. Apple's previous successes, most notably the "Apple II," had been in the home computer market. With Lisa, Apple hoped to service the computer needs of medium-size to large corporations. Lisa contained a number of technological innovations which later proved to be commercially viable when incorporated into the "Macintosh" home computer. For example, Lisa pioneered use of the "mouse"--a hand-held device which allows the operator to communicate with the computer without using the keyboard--and "icons"--graphic displays of the computer's functions. However, Lisa and Twiggy themselves proved to be unsuccessful commercially. Apple replaced Twiggy with another disk-drive system before actual sales of Lisa began. Apple discontinued Lisa altogether shortly after the close of the class period.
 
 
 4
 The named plaintiffs represent a certified class of persons who purchased Apple stock during the class period. They allege that Apple and its top officers made a number of highly positive statements about Lisa and Twiggy during the class period. For example, on November 29, 1982, Apple issued a press release introducing Twiggy, and claiming that "[i]t represents three years of research and development and has undergone extensive testing and design verification during the past year." In a Business Week article published on January 31, 1983, Apple's former Chairman of the Board, Steven P. Jobs, is quoted as stating: "I don't think we will have any problem selling all the Lisas we can build." In a Wall Street Journal article published on April 14, 1983, Jobs is quoted as stating: "Lisa is going to be phenomenally successful in the first year out of the chute."[1] Plaintiffs attribute volatility in Apple's common stock price to these optimistic statements. Apple's stock price soared during the class period, reaching a high of almost $63 per share, and bottomed out at a bit over $17 per share shortly after the class period when Apple disclosed news of Lisa's disappointing sales.
 
 
 5
 Plaintiffs claim that Apple's officers recklessly ignored a number of problems with Lisa and Twiggy which tended to undermine their public optimism. First, internal tests conducted by Apple indicated some slowness and unreliability in Twiggy's information-processing capabilities. Second, communications among Apple's insiders revealed concern that Lisa could not be made compatible with the IBM computer products which dominated the office computer market. Third, there was also concern within Apple that independents would not design software for Lisa. Finally, before beginning actual sales, Apple submitted Lisa prototypes for use by potential customers on a trial basis, and for the inspection of industry analysts and the press. As a result of this test-marketing, Apple received generally enthusiastic reports, and built up a backlog of over 10,000 pre-shipment orders. However, the press and many of the targeted customers raised questions about the wisdom of Lisa's proposed $9,995 retail price. In light of these problems, plaintiffs claim that Apple's unqualified optimism was false and misleading, and actionable under Section 10(b) of the Securities Exchange Act and Rule 10b-5 enacted thereunder.
 
 
 6
 Although plaintiffs allege that Apple did not fairly and adequately inform the market about Lisa's prospects, many of the risks and underlying problems were widely publicized. For example, the same Business Week article which quotes Jobs as stating his belief that Apple would have little trouble selling Lisa also states: "One indication of how uncertain Apple's prospects are is that expert estimates of how many Lisas the company will sell are all over the lot--from 2,000 to 30,000." The article also questions whether independent software writers would support Lisa, and whether the $9,995 price tag was realistic. Similarly the Wall Street Journal article in which Jobs predicts that Lisa will be "phenomenally successful" is entitled "Some Warm Up to Apple's 'Lisa,' but Eventual Success is Uncertain." The article details Apple's difficulties in achieving IBM-compatibility, in attracting independent software suppliers, and in raising consumer interest at $9,995. On the other hand, both articles and many others identified by the parties report positive evaluations of Lisa by many large corporations--a number of which expressed interest in purchasing the machine.
 
 
 7
 In three separate orders, the trial court granted Apple summary judgment against plaintiffs on their entire case.[2] With respect to two of the alleged misstatements, the court held that there was no genuine issue as to scienter. The court held that the remainder of the statements were either not misleading or immaterial as a matter of law, since the information necessary to make the statements not misleading was adequately reported by the press.
 
 
 8
 On appeal, plaintiffs argue that the trial court misapplied the standard for materiality in a fraud on the market case. They claim that, notwithstanding the press' attention to Lisa's shortcomings, Apple's omissions were material because a reasonable investor would place greater weight on the opinions of corporate insiders. Plaintiffs also argue that evidence of sales of Apple stock during the class period raises a genuine issue as to the defendants' good faith, and evidence that Lisa would be a commercial failure raises a genuine issue as to whether defendants' optimism had a reasonable basis. Finally, plaintiffs argue that the trial court invaded the province of the jury by either ignoring or discrediting the testimony of plaintiffs' expert that Apple's nondisclosures were material and the evidence of volatility in Apple's common stock price.
 
 STANDARD OF REVIEW
 
 9
 A grant of summary judgment is reviewed de novo. See e.g., California Architectural Building Products, Inc. v. Franciscan Ceramics, Inc., 818 F.2d 1466, 1468 (9th Cir.1987), cert. denied, 484 U.S. 1006, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988). We may affirm on any ground supported by the record. Islamic Republic of Iran v. Boeing Co., 771 F.2d 1279, 1288 (9th Cir.1985), cert. dismissed, 479 U.S. 957, 107 S.Ct. 450, 93 L.Ed.2d 397 (1986).
 
 
 10
 Under Fed.R.Civ.P. 56(c), summary judgment is appropriate where there is "no genuine issue as to any material fact," and the moving party is "entitled to a judgment as a matter of law." This standard "mirrors the standard for a directed verdict under Federal Rules of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-51, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). "No longer can it be argued that any disagreement about a material issue of fact precludes the use of summary judgment." California Architectural Building Products, 818 F.2d at 1468.
 
 
 11
 The party moving for summary judgment has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions" of the record showing the absence of a genuine issue of fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The burden then shifts to the nonmoving party to present evidence sufficient to support a verdict in its favor on every element of its claim for which it will carry the burden of proof at trial. Id. at 322-23, 106 S.Ct. at 2552-53. "If the [nonmoving party's] evidence is ... not sufficiently probative ... summary judgment may be granted." Anderson, 477 U.S. at 249-50, 106 S.Ct. at 2511.
 
 
 12
 Materiality and scienter are both fact-specific issues which should ordinarily be left to the trier of fact. See Basic, Inc. v. Levinson, 485 U.S. 224, 108 S.Ct. 978, 982, 985-87, 99 L.Ed.2d 194 (1988); Vucinich v. Paine, Webber, Jackson & Curtis, Inc., 739 F.2d 1434, 1436 (9th Cir.1984) (per curiam). However, summary judgment may be granted in appropriate cases. See Ross v. Bank South, N.A., 837 F.2d 980, 1003 (11th Cir.1988) (affirming summary judgment on issue of scienter in securities fraud case); Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).
 
 
 13
 SECTION 10(b) LIABILITY UNDER A FRAUD ON THE MARKET THEORY
 
 
 14
 Rule 10b-5, enacted under Section 10(b), makes it unlawful "[t]o make any untrue statement of fact or to omit to state a material fact necessary to make the statements made, in light of all the circumstances in which they were made, not misleading." The most obvious example of a false or misleading statement is a misrepresentation of historic fact. The statement that "Apple began volume shipments June One of its new $10,000 Lisa Computer," for example, may be actionable if volume shipments did not in fact begin until the middle of June, if the inaccuracy is material, and if it was made recklessly or in bad faith. See, e.g., Bell v. Cameron Meadows Land Co., 669 F.2d 1278, 1281 (9th Cir.1982).
 
 
 15
 Most of the statements challenged by plaintiffs are projections or general expressions of optimism, as opposed to simple representations of historic fact. The "truth" of such statements as the prediction that "Lisa is going to be phenomenally successful" and the assertion that "we are very pleased with the market acceptance and orders to date" presents more subjective issues. Nonetheless, projections and general expressions of optimism may be actionable under the federal securities laws. See, e.g., Marx v. Computer Sciences Corp., 507 F.2d 485, 489-92 (9th Cir.1974); G & M Inc. v. Newbern, 488 F.2d 742, 745-46 (9th Cir.1973). A projection or statement of belief contains at least three implicit factual assertions: (1) that the statement is genuinely believed, (2) that there is a reasonable basis for that belief, and (3) that the speaker is not aware of any undisclosed facts tending to seriously undermine the accuracy of the statement. A projection or statement of belief may be actionable to the extent that one of these implied factual assertions is inaccurate. Marx, 507 F.2d at 490.
 
 
 16
 Plaintiffs bring their claim under the so-called "fraud on the market" theory first recognized by this court in Blackie v. Barrack, 524 F.2d 891 (9th Cir.1975), cert. denied, 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976). In the usual claim under Section 10(b), the plaintiff must show individual reliance on a material misstatement. Under the fraud on the market theory, the plaintiff has the benefit of a presumption that he has indirectly relied on the alleged misstatement, by relying on the integrity of the stock price established by the market. The Supreme Court has recently considered a corporate insider's liability for affirmative misrepresentatives under the fraud on the market theory. Basic, Inc. v. Levinson, 108 S.Ct. 978 (1988). This case raises similar issues with regard to misleading predictions or statements of belief.
 
 
 17
 Liability for Failure to Disclose Material Risks
 
 
 18
 The most closely controverted issue in this case is whether the defendants' optimistic statements about Lisa and Twiggy are shielded from liability because of the press' documentation of the relevant risks. The trial court held that disclosures by the press rendered the defendants' omissions immaterial. Ordinarily, omissions by corporate insiders are not rendered immaterial by the fact that the omitted facts are otherwise available to the public. See, e.g., Hughes v. Dempsey-Tegeler & Co., 534 F.2d 156 (9th Circ.1976); Fisher v. Plessey Co., 559 F.Supp. 442, 445 (S.D.N.Y.1983). Where a plaintiff alleges actual reliance on a particular statement, it does not matter that the market is aware of the facts necessary to make the statement not misleading. The plaintiff may be misled into believing that the stock has been incorrectly valued by the market.
 
 
 19
 The situation is different in a fraud on the market case. In a fraud on the market case, the plaintiff claims that he was induced to trade stock not by any particular representations made by corporate insiders, but by the artificial stock price set by the market in light of statements made by the insiders as well as all other material public information. Provided that they have credibly entered the market through other means, the facts allegedly omitted by the defendant would already be reflected in the stock's price; the mechanism through which the market discovered the facts in question is not crucial.
 
 
 20
 The point is best illustrated by way of example. Assume that only two "facts" are relevant to Lisa's prospects, and assume that both facts are equally "true": (1) Apple's Chairman of the Board believes that Lisa will be phenomenally successful, and (2) a number of potential customers have balked at Lisa's proposed $9,995 retail price. Where both facts are transmitted to the market with roughly equal intensity and credibility, the market will receive complete and accurate information. Informed investors will invest in light of an accurate appreciation of the relevant risks. Those investors who know only of the Chairman's optimism may overvalue Apple stock; those who know only of the problems with the suggested retail price may undervalue the stock. However, it is a basic assumption of the securities laws that the partially-informed investors will cancel each other out, and that Apple's stock price will accurately reflect all relevant information.[3] Particular individuals who hear only one of the two facts may receive a distorted impression of Lisa, and thus may have an actionable claim. But the market, and any individual who relies only on the price established by the market, will not be misled.
 
 
 21
 In a recent opinion, the Supreme Court has explicitly embraced this line of reasoning. See Basic, 108 S.Ct. at 992. In Basic, a would-be class of stock holders alleged that corporate insiders fraudulently depressed the price of the corporation's stock by falsely denying that they were engaged in merger negotiations. Defendants opposed class certification on the theory that questions of individual reliance on the alleged misstatements predominated over common questions. The trial court overcame that obstacle to class certification by holding that all members of the putative class were entitled to a presumption that they relied on the stock price established by the market, which in turn reflected the alleged misstatements. The Supreme Court approved the trial court's adoption of the fraud on the market theory. However, it stressed that the presumption of reliance could be rebutted by a showing that information sufficient to correct the defendants' alleged misstatements was transmitted through market price in the same fashion as the misstatements themselves. The Court stated:
 
 
 22
 For example, if petitioners could show that the "market makers" were privy to the truth about the merger discussions ... and thus that the market price would not have been affected by their misrepresentations, the causal connection could be broken: the basis for finding that the fraud had been transmitted through market price would be gone. Similarly, if, despite petitioners' allegedly fraudulent attempt to manipulate market price, news of the merger discussions credibly entered the market and dissipated the effects of the misstatements, those who traded Basic shares after the corrective statements would have no direct or indirect connection with the fraud.
 
 
 23
 Id.
 
 
 24
 We conclude that in a fraud on the market case, the defendant's failure to disclose material information may be excused where that information has been made credibly available to the market by other sources. The issue with regard to the bulk of Apple's misstatements is whether, in light of the press' documentation of Lisa's risks, a rational jury could nonetheless find a "substantial likelihood" that full disclosures by Apple would have "significantly altered the 'total mix' of information made available." TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976).
 
 
 25
 With respect to two of the challenged statements, there are genuine issues of material fact. In a November 29, 1982 press release, Apple stated that Twiggy "ensures greater integrity of data than the other high density drives by way of a unique, double-sided mechanism designed and manufactured by Apple." (Statement 4). Apple also claimed that Twiggy "represents three years of research and development and has undergone extensive testing and design verification during the past year." (Statement 5). At the time these optimistic statements were made, internal tests conducted by Apple indicated slowness and unreliability in Twiggy's information-processing capabilities. Approximately two weeks before the press release was issued, the Apple division responsible for production of Lisa warned top executives that "[a]s of now, the Twiggy reliability would lead us to DELAY THE INTRODUCTION OF LISA BY MANY MONTHS." On December 6, 1982, Steven Jobs expressed "virtually zero confidence" in the division that was responsible for the design and development of Twiggy.
 
 
 26
 There is at least a triable issue of whether Twiggy's technical problems were material facts tending to undermine the unqualified optimism of Statements 4 and 5. Unlike the information about Lisa's market risks, these problems were not made known to the market by the press or by anyone else. However, the November 29, 1982 press release stated that Twiggy would not be available until the following spring. Apple has produced affidavits from several market experts stating that when a computer industry product is announced for future availability, the market fully understands that the product is still in the development stage. Apple therefore claims that the market did not understand Statements 4 and 5 as implying that Twiggy was ready to perform, and that the technical problems Apple was encountering did not materially undermine the optimistic press release.
 
 
 27
 Whether this argument has merit is a question which should be decided by the jury. The expert affidavits introduced by Apple never state definitively that the market as a whole was aware that there was a problem with Twiggy. There is a difference between knowing that any product-in-development may run into a few snags, and knowing that a particular product has already developed problems so significant as to require months of delay. We are unable to say as a matter of law that Apple's failure to disclose Twiggy's technical problems had no misleading effect on market price.
 
 
 28
 The remainder of the challenged statements involved Lisa, or Apple generally, rather than Twiggy. Although many of these statements failed to disclose material risks, we agree with the trial court that there are no genuine issues of fact under a fraud on the market theory. The press portrayed Lisa as a gamble, with the potential for either enormous success or enormous failure. At least twenty articles stressed the risks Apple was taking, and detailed the underlying problems producing those risks. Many of the optimistic statements challenged by plaintiffs appeared in those same articles, essentially bracketed by the facts which plaintiffs claim Apple wrongfully failed to disclose. The market could not have been made more aware of Lisa's risks.
 
 
 29
 We stress the limits of our holding. Scrutiny by the press will not ordinarily excuse the type of unqualified exuberance expressed by Apple and its officers in this case. Even in a fraud on the market case, corporate insiders are not relieved of their duty to disclose material information where that information has received only brief mention in a few poorly-circulated or lightly-regarded publications. The investing public justifiably places heavy reliance on the statements and opinions of corporate insiders. In order to avoid Rule 10b-5 liability, any material information which insiders fail to disclose must be transmitted to the public with a degree of intensity and credibility sufficient to effectively counter-balance any misleading impression created by the insiders' one-sided representations. See Basic, 108 S.Ct. at 992 (the presumption that a fraudulent statement has been transmitted through market price may be rebutted by a showing that "corrective statements" have "credibly entered the market") (emphasis added). That standard has been met in this case because of the press' intense, sustained focus on Lisa and her risks.
 
 
 30
 Plaintiffs argue that summary judgment is nonetheless inappropriate because their claim of materiality was supported by evidence of stock price movements, and by the testimony of plaintiffs' expert. The evidence of stock price movement does not raise a genuine issue of material fact. The crucial issue with regard to most of the optimistic statements is whether the statements were misleading because they omitted material information. Dramatic price movements in response to an optimistic statement would provide a strong indication that the statement itself was material, but would not suggest that material information tending to undermine the statement has not been made available to the market. An entirely plausible explanation would be that the market was persuaded by Apple's optimism notwithstanding the known risks. In that case, the optimistic statement could still result in liability if the statement was not genuinely believed, or if that belief lacked a reasonable basis. See Marx, 507 F.2d at 490-91. But the evidence of stock price movements provides no rational basis for determining whether Lisa's risks were adequately conveyed to the public, and therefore is not enough to get plaintiffs to the jury on the first theory of liability in Marx.
 
 
 31
 More problematic is the testimony by plaintiffs' expert to the effect that the investment community pays special attention to the statements of corporate management and that Apple's nondisclosures were therefore material. As a general rule, summary judgment is inappropriate where an expert's testimony supports the nonmoving party's case. See, e.g., Bieghler v. Kleppe, 633 F.2d 531, 534 (9th Cir.1980). However, where the evidence is as clear as that in this record, the court is not required to defer to the contrary opinion of plaintiffs' "expert." It does not require any special competence to read the pertinent press reports and conclude that Lisa's risks were adequately conveyed to the public.
 
 Scienter
 
 32
 With regard to the great bulk of the statements challenged by the plaintiffs, we have held that the publicity surrounding Lisa was sufficient to shield Apple from liability for failing to disclose material risks. Apple alternatively argues that it is nonetheless entitled to summary judgment because there is no rational basis in the record for concluding that any of the challenged statements was made with the requisite scienter. We have interpreted scienter to include recklessness. Vucinich, 739 F.2d at 1435.
 
 
 33
 Except for statements four and five, we agree with Apple. The significant technological flaws in Twiggy raise a genuine issue of material fact as to these statements' recklessness. However, plaintiffs produced no evidence controverting defendants' good faith basis for making the other statements. Each of Apple's officers filed an affidavit stating that he acted in good faith belief that his optimistic statements were accurate and not misleading. Apple's massive investment in Lisa demonstrates this good faith. Apple's officers also had a reasonable basis for their optimism about Lisa, given the novelty of Lisa's technology, the positive responses Apple had received from its test-marketing and from the press, and the substantial backlog of pre-shipment orders. Plaintiffs contend that much of the evidence available to Apple suggested that Lisa's prospects were bleak. The results of Apple's test marketing, its internal studies, and reports by the press all may have suggested that Lisa was a gamble. But none of these sources suggested that optimism was unrealistic. Granting them every reasonable inference, plaintiffs can only show that Lisa's prospects were uncertain. Such a showing is insufficient to support liability as a matter of law. See Ernst & Ernst v. Hochfelder, 425 U.S. 185, 206, 96 S.Ct. 1375, 1387, 47 L.Ed.2d 668 (1976) (a defendant may not be found liable under Rule 10b-5 "unless he acted other than in good faith").
 
 
 34
 Plaintiffs also point to evidence that defendants collectively sold about 8% of their Apple holdings valued at roughly $84 million during the class period. Plaintiffs claim that these sales are inconsistent with Apple's expressed optimism, and raise a genuine issue as to the defendants' good faith. Insider trading in suspicious amounts or at suspicious times is probative of bad faith and scienter. See, e.g., Goldman v. Belden, 754 F.2d 1059, 1070 (2d Cir.1985). However, the pattern of stock trading by Apple's insiders is insufficient to raise an issue for the jury. The defendants collectively sold a slightly greater number of shares during an equal period of time just before the class period than they did during the class period. Uncontradicted deposition testimony from several of the defendants provided credible and wholly innocent explanations for the stock sales, ranging from long-standing programs of periodic divestment, to the need to free cash to meet matured tax liabilities. These unrebutted explanations are sufficient to defeat any inference of bad faith. See Freeman v. Decio, 584 F.2d 186, 197 n. 44 (7th Cir.1978) (inference that defendants were acting in bad faith "can be nullified by a showing that sales in question were consistent in timing and amount with a past pattern of sales or that other circumstances might reasonably account for their occurrence") (affirming grant of summary judgment on issue of scienter).
 
 
 35
 Plaintiffs finally focus on an episode of trading in the month immediately preceding the class period. During this time, the defendants sold roughly as much stock by share as they sold in the preceding 10 months, and roughly half as much as they sold during the class period. Plaintiffs argue that this trading blip--for which a single defendant was primarily responsible--raises an inference that defendants had become aware shortly before announcing Lisa to the public that Lisa would probably be a failure. We cannot agree. Large sales of stock before the class period are inconsistent with plaintiffs' theory that defendants attempted to drive up the price of Apple stock during the class period. As sophisticated investors, defendants must have known that pre-class period sales would deprive them of much of the value of their "false" optimism. Those cases basing a finding of bad faith on insider trades have involved trades in amounts dramatically out of line with prior trading practices at times calculated to maximize personal benefit from undisclosed inside information. See, e.g., Lilly v. State Teachers Retirement System, 608 F.2d 55, 56 (2d Cir.1979), cert. denied, 446 U.S. 939, 100 S.Ct. 2159, 64 L.Ed.2d 792 (1980) (sale of 80,000 shares nine days prior to public announcement that "problem loans" had increased from $7 million to $16 million); SEC v. Musella, 578 F.Supp. 425, 441 (S.D.N.Y.1984) (multiple episodes of stock trades within days or weeks of "public announcements having a significant market impact on the value of the securities"); Jefferies & Co. v. Arkus-Duntov, 357 F.Supp. 1206 (S.D.N.Y.1973) (sale of 40,000 shares two days before the SEC suspended trading in the stock). The pre-class period sales were so inauspiciously timed that a jury would have little or no justification in inferring that they were motivated by the belief that Lisa would be a failure.
 
 
 36
 Any remote inference of bad faith arising from the defendants' stock sales is completely dispelled by the defendants' overall pattern of conduct. Throughout the class period, the defendants continued to stake much of Apple's future on the success of Lisa, pouring millions of dollars into product development, market research, and promotions. At the same time, defendants retained the great bulk of their Apple holdings, and held on in the face of a decline in value of almost 75% following disclosure of Lisa's disappointing sales. The most that can be said of the evidence in this case is that while defendants bet quite heavily on Lisa, they did not put all of their eggs in the same basket. We cannot conclude that this conduct is so inconsistent with the defendants' expressed optimism as to raise a triable issue regarding the defendants' good faith.
 
 THE STATEMENTS
 
 37
 Plaintiffs argue that the trial court erred by considering each of the challenged statements in isolation, rather than looking to the overall pattern of deception carried out by Apple. As we have discussed, any overall impression created by Apple's optimism was adequately counter-balanced by the press' documentation of Lisa's risks. Plaintiffs may defeat summary judgment only by showing a genuine issue of fact with regard to a particular statement by Apple or its insiders. Except with regard to the statements about Twiggy, plaintiffs have failed to meet this burden.
 
 
 38
 Statements 1, 2 and 3. The first three statements appeared in Apple's 1982 Annual Report, issued on November 12, 1982. Defendants Jobs and Markkula boast of Apple's "unequalled strength, experience and expertise," and announce that a "significant breakthrough," Lisa, will be introduced in 1983. (Statement 1) Another employee opines: "From all I've seen so far, success should continue." (Statement 2) Apple reports that its forecasting process had been "refined." (Statement 3). There were sound historical and factual bases for each of these statements. At the time the statements were made, Apple had established a successful track record, and there were no indications that this success would not continue. Lisa was a promising, innovative product-in-development. Apple had recently refined its planning process. A rational jury could not find these statements materially misleading. The 1982 Annual Report contained frank admissions regarding the uncertainties in the computer industry.
 
 
 39
 Statements 4 and 5. We have already considered Statements 4 and 5. There is evidence in the record from which a jury could conclude that Apple was aware of significant technical problems with Twiggy, which it did not disclose and which were not otherwise made known to the market, and which tended to materially undermine Apple's stated optimism. This evidence is enough to raise an issue for the jury.
 
 
 40
 Statements 6, 7, 8 and 9. The next four statements all appeared in press reports between January and April of 1983. Various of the defendants make the following assertions: "Lisa incorporates the latest software and hardware technology." (Statement 6); "I don't think we will have any trouble selling all the Lisas we can build." (Statement 7); "Lisa is going to be phenomenally successful the first year out of the chute." (Statement 8); and "[Lisa] is going to make Apple's growth before this look small." (Statement 9) Each of these general expressions of optimism was made in the context of a barrage of publicity regarding Lisa's riskiness. There is no genuine issue under a fraud on the market theory.
 
 
 41
 Statement 10. In an April 14, 1983 Wall Street Journal article, an Apple employee is quoted as stating: "We find people willing to put down $10,000 without blinking an eye," and "more companies are willing to commit themselves to larger orders than Apple has expected." At the time this statement was made, Apple had a pre-shipment backlog of over 10,000 Lisa orders. Plaintiffs argue that the statement is nonetheless misleading because Apple failed to disclose that customers could cancel these pre-shipment orders without penalty. However, Apple introduced unrebutted testimony from four securities analysts that it was well understood within the investment community that computer orders are "soft." The analysts further testified that the market understood that the backlog of Lisa orders was soft, and that Statement 10 was received in that light. Plaintiffs have raised no genuine issue regarding whether Apple's failure to disclose the softness of Lisa orders misled the market. A jury could not find Apple liable under a fraud on the market theory.
 
 
 42
 Statements 11, 12, 13, 14 and 16. In Statements 11-14 and 16, various of the defendants express satisfaction with the early market reception of Lisa: "We are extremely pleased with the market acceptance and orders to date." (Statement 11); "The acceptance of Lisa among accounts has been very strong." (Statement 12); "The interest by individuals at the dealer level has surprised us." (Statement 13); "[Lisa orders] are double what had been anticipated." (Statement 14); and "[W]e remain pleased with [Lisa's] market acceptance, order rate and dealer enthusiasm. Lisa is clearly being recognized as an important force in the office market." (Statement 16). Statements 11-14 were all made before actual sales of Lisa began. In light of a pre-shipment backlog of over 10,000 orders, no rational jury could find that these statements lacked a reasonable basis. Although Statement 16 was made shortly after sales of Lisa had begun, the claim that Lisa is being recognized as an "important force" was not undermined by any nonpublic information available to Apple at the time. Lisa sales did not begin to dip below those forecasted in Apple's 1983 Business Plan until after Statement 16 was issued.
 
 
 43
 Statement 15. In Statement 15, an Apple employee asserts that volume shipments of Lisa began on June 1, 1983, when they did not in fact begin until later that month. Although the trial court ultimately found this misstatement material, plaintiffs have made no showing that a reasonable investor would regard the two-week error as significant. In addition, plaintiffs have produced no evidence that the statement was anything other than an honest mistake. Summary judgment is appropriate on either materiality or scienter grounds.
 
 CONCLUSION
 
 44
 Plaintiffs have raised genuine issues of material fact in support of their claims that the optimistic statements about Twiggy were materially misleading. We remand so that plaintiffs can present these claims to a jury. However, there are no triable issues with regard to the remainder of plaintiffs' claims. Defendants have conclusively established that all material information tending to undermine their optimistic statements about Lisa had credibly entered the market. There is no rational basis for concluding that the defendants did not genuinely and reasonably believe that these statements were accurate. The trial court properly granted summary judgment.
 
 
 45
 Each party shall bear its own costs on appeal.
 
 
 46
 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
 
 
 
 [1]
 In all, plaintiffs have identified sixteen statements which they claim to be fraudulent. Each of those statements is considered separately later in this opinion
 
 
 [2]
 In re Apple Computer Securities Litigation, 672 F.Supp. 1552 (N.D. Cal.1987); In re Apple Computer Securities Litigation, 696 F.Supp. 490 (N.D.Cal.1987); and In re Apple Computer Securities Litigation, 690 F.Supp. 872 (N.D.Cal.1987)
 
 
 [3]
 "Recent empirical studies have tended to confirm Congress' premise that the market price of shares traded on well-developed markets reflects all publicly available information...." Basic, 108 S.Ct. at 991. See In re LTV Securities Litigation, 88 F.R.D. 134, 144 (N.D.Tex.1980) (citing studies)