Jonathan **MITTMAN**, et al., Plaintiffs,

v.

**RALLY'S HAMBURGERS, INC.,
et al., Defendants.**

**Civil Action No. 3:94CV–39–S.**

United States District Court,
W.D. Kentucky
at Louisville.

Aug. 25, 2003.

---

Steven J. Aaronoff, Christensen, Miller, Fink, Jacobs, Glaser, Weil, Shapiro, LLP, Gregory L. Call, Milbank, Tweed, Hadley & McCloy, Los Angeles, CA, Charles H. Cassis, Goldberg & Simpson, Louisville, KY, Terry Christensen, Shari Cohen, Catherine Fazio, Christensen, Miller, Fink, Jacobs, Glaser, Weil, Shapiro, LLP, Los Angeles, CA, Asheesh Goel, Sidley & Austin, Chicago, IL, Jonathan D. Goldberg, Goldberg & Simpson, Louisville, KY, Janet P. Jakubowicz, Greenebaum, Doll & McDonald, Edmund P. Karem, Sitlinger, McGlincy, Steiner, Theiler & Karem, Louisville, KY, Eric N. Landau, Stephen Y. Ma, Laura Premi, Christensen, Miller, Fink, Jacobs, Glaser, Weil, Shapiro, LLP, Los Angeles, CA, M. Kathleen McGowan, Nancy A. Temple, Jeffrey R. Tone, Sidley & Austin, Chicago, IL, Jan M. West, Goldberg & Simpson, Louisville, KY, Daniel Bryan Wickens, R. Van Young, Greenebaum, Doll & McDonald, Scott P. Zoppoth, Louisville, KY, for Defendant.

Howard D. Finkelstein, Finkelstein & Associates, San Diego, CA, John E. Grasberger, Milberg, Weiss, Bershad, Hynes & Lerach, San Francisco, CA, Ellen A. Gusikoff, Spector & Roseman, G. Paul Howes,

Milberg, Weiss, Bershad, Hynes & Lerach, Mark L. Knutson, Finkelstein & Associates, Jeffrey Krinsk, Finkelstein & Associates, William S. Lerach, Sharon T. Maier, Milberg, Weiss, Bershad, Hynes & Lerach, Milberg, Weiss, Bershad, Hynes & Lerach San Diego, CA, R. Bruce McNew, Taylor, Gruver & McNew, Greenville, DE, Mark A. Ogle, Fort Mitchell, KY, Ronald R. Parry, Parry, Deering, Futscher & Sparks, Covington, KY, Eugene A. Spector, Spector & Roseman, San Diego, CA, for Plaintiff.

Gregory L. Call, C. Stephen Howard, Jeffery D. McFarland, Scott Vick, Milbank, Tweed, Hadley & McCloy, Los Angeles, CA, Katherine Gail Russell, Goldberg & Simpson, Louisville, KY, for Intervenor.

George H. Palmer, Strauss & Troy, Cincinnati, OH, for Mediator.

### MEMORANDUM OPINION

SIMPSON, District Judge.

This matter is before the court on motion of the defendants, Rally's Hamburgers, Inc., GIANT GROUP, LTD., Burt Sugarman, Wayne M. Albritton, Donald C. Moore, Charles W. Klausman, Gena L. Morris, and Patricia L. Glaser, (collectively, the "Rally's defendants") for summary judgement, pursuant to Fed.R.Civ.P. 56.

This action was filed by six individual plaintiffs, Jonathan Mittman, Steven Horowitz, Dina Horowitz, John Hannan, Edward L. Davidson, and Rick Sweeney, on their own behalf and as representatives of the class of all persons who purchased or otherwise acquired the common stock of Rally's Hamburgers, Inc. from July 20, 1992 through September 29, 1993 (the "class period"), alleging that they suffered damage as a result of such purchases. It is alleged that during the class period the above-named defendants, acting in concert with Arthur Andersen LLP ("AA"), deliberately misstated or concealed information from the investing public concerning Rally's operations, financial condition and future prospects in an attempt to artificially inflate Rally's stock prices for certain insiders' personal gain. The court concluded in an earlier opinion that "the plaintiffs have failed to show such severe recklessness [by AA in their capacity as accountants for the Rally's defendants] as would meet the high and exacting standard required to successfully establish an intent to defraud or deceive under [section] 10(b) [of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5]." (DN 353). All claims against AA have been dismissed.

The remaining defendants have moved for summary judgment on the ground that the plaintiffs have failed to come forward with evidence to show that a triable issue of fact exists with respect to a number of essential elements of the plaintiffs' claims. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–248, 106 S.Ct. 2505, 2509–2510, 91 L.Ed.2d 202 (1986). Summary judgment is appropriate only when there is no genuine issue of material fact, and the movant is entitled to judgment as a matter of law. *Bass v. Janney Montgomery Scott, Inc.*, 210 F.3d 577, 587 (6th Cir.2000). At the summary judgment stage, it is not the court's function to weigh the evidence, but rather to determine whether a reasonable jury could return a verdict for the nonmoving party, viewing all facts and inference in the nonmovant's favor. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. There must be more than "some metaphysical doubt as to the material facts" in question. The nonmovant must provide "concrete evidence supporting its claims and establishing the existence of a genuine issue of fact." *Cloverdale Equipment Company v.*

*Simon Aerials, Inc.*, 869 F.2d 934, 937 (6th Cir.1989), *citing, Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Matsushita Electric Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The court has evaluated the allegations of the complaint, the reports of the experts, and documentation concerning the events which transpired during the class period. For the reasons articulated more fully below, the court concludes that the plaintiffs have failed to come forward with evidence sufficient for a reasonable jury to find that the Rally's defendants violated § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5. Further, the plaintiffs have similarly failed to establish a triable issue as to their claim of common law negligent misrepresentation. Summary judgment will be granted in favor of the Rally's defendants by separate order.

Scores of investors, hopeful of riding a wave of success, purchased shares of Rally's Hamburgers, Inc., touted as a "growth stock," but found themselves chagrined when the company did not perform as well as was expected. Lawsuits challenging the management of companies often arise from such investor disappointments. These suits seek explanations for unmet expectations, and attempt to find and uncover fraud. Sometimes wrongdoing is uncovered. But in this case, as in others, the claims of wrongdoing are based upon a fiction that poor management constitutes fraud if a company's plans for continued growth do not succeed. The courts are advised to avoid the trap of finding fraud by hindsight. *See, Eisenstadt v. Centel Corp.,* 113 F.3d 738, 746 (7th Cir.1997) and cases cited therein.

The Rally's defendants are alleged to have violated 15 U.S.C. § 78j(b) which states that

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

... (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

17 C.F.R. § 240.10b–5 delineates the following unlawful acts:

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

To prevail on a claim under 10(b) and rule 10b–5, the plaintiffs must prove (1) a misrepresentation or an omission of material fact (2) made with scienter (3) in connection with the purchase or sale of a security (4) upon which the plaintiffs reasonably relied or which resulted in fraud on the market and (5) which caused damage to the plaintiffs. *In re Comshare, Inc. Securities Litigation,* 183 F.3d 542, 548 (6th Cir.1999); *Platsis v. E.F. Hutton & Co.,* 946 F.2d 38, 40 (6th Cir.1991), *cert. denied,*

503 U.S. 984, 112 S.Ct. 1669, 118 L.Ed.2d 389 (1992). To invoke a presumption of reliance through a fraud on the market theory, the plaintiffs must show that material, public misrepresentations were made, that the shares were traded on an efficient market, and that shares were traded between the time the misrepresentations were made and the time the truth was revealed. *Basic, Inc. v. Levinson,* 485 U.S. 224, 248 n. 27, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988).

The plaintiffs contend that the Rally's defendants committed fraud on the market by projecting the company's growth for 1993 to be greater than what could be realistically achieved, failing to warn the market along the way that they knew that the company would not reach those goals, failing to reserve sums for a probable adverse litigation outcome, and utilizing accounting manipulations which caused the financial statements to be materially overstated.

## I.

 First, the court finds that there is no evidence that the Rally's defendants had reason to believe that the company would probably suffer an adverse outcome in what has been termed the "Shortstop litigation" initiated against it in Texas. The plaintiffs do not offer any direct evidence that the Rally's defendants believed before the trial in September, 1993 that the company would be found liable to Shortstop. Rather, the plaintiffs suggest that a reasonable inference might be

drawn as to such a belief from the fact that:

1. In November, 1991, Burt Sugarman[1] directed Charles Klausman[2] to investigate the possibility of settlement.

2. The Rally's corporate records do not contain minutes from the November 20, 1991 board of directors meeting.

3. An unsigned version of the minutes of the November 20, 1991 were provided to AA. Those minutes did not contain any reference to the inquiry into settlement.

4. Attorney Hilleboe[3] was asked to provide Rally's a written report evaluating whether the Brown Todd and Heyburn law firm had committed malpractice in delaying the filing of Rally's complaint against Shortstop.

5. Neither investors nor AA was informed as to the contents of the Hilleboe report, in which he opined that "but for Brown, Todd's delay in this matter, Rally's would not have been sued." [ie. the *Shortstop* litigation against Rally's would not have been commenced].

## a.

Consideration of settlement and investigation of possible third-party liability, common business practices, do not warrant the conclusion that Rally's believed it would ultimately lose the Shortstop litigation. Absent evidence of such a belief, the Rally's defendants had nothing to disclose to AA, and there is nothing untoward in Rally's decision not to reveal these in-house matters.

---

1. Burton Roy Sugarman, Chairman of the Board and the Board's Executive Committee; CEO of Rally's Hamburgers Inc. during the class period; owner of approximately 39% of Rally's stock during the class period; Chairman of the Board, CEO and owner of 50% of the outstanding stock of GIANT GROUP, LTD.

2. Charles William Klausman, Sr. Vice President, General Counsel, and Secretary of the Board of Rally's Hamburgers, Inc.

3. Douglas L. Hilleboe, Esq., outside counsel for Rally's, hired in connection with the Texas *Shortstop* litigation.

*b.*

The plaintiffs ascribe a sinister motive to the "disappearance" of the minutes for the November 20, 1991 board meeting. While it is certainly problematic that the official minutes of a board meeting of a publicly traded company cannot be produced, that fact alone establishes nothing beyond sloppy business practices. However, linking this supposed sinister activity to other facts, the plaintiffs make a leap of faith to conclude that the Rally's defendants were deliberately trying to conceal a belief that they would lose the Shortstop litigation in order to avoid a set aside of financial reserves for that contingency. There is simply no evidence upon which a reasonable jury could be permitted to reach such a conclusion on the record evidence.

*c.*

Finally, the plaintiffs make an unwarranted leap from the Hilleboe Report to a conclusion that the Rally's defendants believed it was probable that the company would lose on the merits at trial.

The Hilleboe Report provided an opinion on liability of a third party to Rally's. Hilleboe did not evaluate Rally's potential liability in the Shortstop litigation nor the myriad other factors which impact litigation. The report merely expressed Hilleboe's opinion that Brown Todd's conduct was potentially actionable.

*d.*

The apparent impetus for Rally's to settle the Shortstop case came in September, 1993 when damaging expert testimony was adduced at trial which significantly impacted Rally's defense. See, SEC form 10-Q 11/11/93 at pg. 6. The plaintiffs do not dispute that it was at this point during trial that the case settled. Until that time, the defendants expressed confidence in a successful outcome. The plaintiffs have not come forward with evidence that forecast a contrary result.

As none of the supposed concealments relating to the Shortstop litigation warrant the nefarious inferences promoted by the plaintiffs, neither do they collectively yield such a result. We find the plaintiffs contentions with respect to the Shortstop litigation to be without merit.

*II.*

The plaintiffs claim that the Rally's defendants acted in concert with AA in violating Generally Accepted Accounting Practices ("GAAP") and materially overstating the company's earnings in 1992 and 1993 for the purpose of artificially inflating the price of Rally's stock. By earlier ruling, this court concluded that AA either did not violate GAAP, or that any deviation did not have a material impact on the financial statements. The court found that AA did not knowingly or recklessly fail to discharge its duties as the independent auditor of Rally's financial statements. AA proposed audit adjustments which the Rally's defendants rejected. AA then evaluated the impact of the recommended adjustments on the financial statements taken as a whole and concluded that the recommended adjustments were not material. In the court's opinion finding that AA's accounting practices and certification of Rally's financial statements did not rise to the level of severe recklessness required to establish a 10(b)/10b–5 violation, the court stated:

AA considered that: 1) $657,000 of the adjustments related to estimates and were therefore subjective in nature, and 2) The total after tax impact was $427,000 which constituted less than 5% of Rally's net income. In AA's final memorandum it referred to its workpapers and summarized its calculations in reaching these conclusions. Plaintiffs'

expert does not dispute that the majority of the adjustments related to estimates. Nor does he dispute that an impact of less than 5% of net, standing alone, would not be material to the financial statements as a whole.

DN 353, at pgs. 9–10.

As noted in *In re Worlds of Wonder Securities Litigation*, 35 F.3d 1407, 1426 (9th Cir.1994),

An expert's conclusory allegations that a defendant acted with scienter are insufficient to defeat summary judgment where the record clearly rebuts any inference of bad faith. [citation omitted] . . . "[T]he mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter." [citations omitted]. [Scienter] requires more that a misapplication of accounting principles. The [plaintiff] must prove that the accounting practices were so deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts. [citations omitted].

Based upon our findings concerning AA's audit of Rally's financial statements, we conclude that the same analysis applies to the claims of fraud against the Rally's defendants as to these matters.

### III.

#### a.

■ The defendants contend that, in evaluating the total mix of information available to the market concerning Rally's development plan, the Rally's defendants' stated goals were tempered by sufficiently vocal scepticism by market experts to provide the market with a clear picture concerning the ambitiousness of their plan. As noted in *In re Apple Computer Securities Litigation*, 886 F.2d 1109 (9th Cir. 1989), in order for public scrutiny to counterbalance any misleading impression created by insiders' one-sided representations (in the *Apple* case, referred to as "unqualified exuberance,") any material information which insiders fail to disclose must be transmitted to the public with a degree of intensity and credibility sufficient to effectively counterbalance any misleading impression. *Id.* at 1116.

■ Where the evidence in the record is clear, summary judgment may be appropriate, despite plaintiffs' expert's testimony that the investment community paid special attention to management and that their non-disclosures were material. As stated in *In re Apple Computer*, 886 F.2d at 1116, . . . "[W]here the evidence is as clear as that in this record, the court is not required to defer to the contrary opinion of plaintiffs' 'expert.' It does not require any special competence to read the pertinent press reports and conclude that [the] risks were adequately conveyed to the public." As explained below, the court finds that such a quantity of credible market evidence existed concerning this investment risk during the class period that it counterbalanced any misrepresentations by the Rally's defendants. "[I]t is the basic assumption of the securities laws that the partially-informed investors will cancel each other out, and that [a] stock price will accurately reflect all relevant information. [footnote omitted]. Particular individuals who hear only one of the two facts may receive a distorted impression . . . and thus may have an actionable claim. But the *market*, and any individual who relies only on the price established by the market, will not be misled." *Id.* at 1114.

### b.

■ Additionally, the defendants contend that the plaintiffs cannot prove scienter with respect to the public statements made during the class period. Scienter, a mental state embracing intent to deceive, manipulate or defraud, is an essential element of a 10(b)/10b–5 claim. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193, 96 S.Ct. 1375, 1380–81, 47 L.Ed.2d 668 (1976). As explained more fully in the next section, we conclude that scienter cannot be proven on the facts in this case.

### c.

The alleged misstatements made during the class period[4] were disseminated through press releases and certain financial documents. These purported misstatements were that Rally's would meet its development goal for 1992 when the defendants knew that it would not, and that the development projection for 1993 was touted as achievable when the defendants knew it was an unattainably high goal.

Rally's made the following statements in its August 4, 1992 stock offering prospectus:

The Company intends to direct its expansion efforts primarily in existing and contiguous markets ... Exclusive of acquisitions, the Company's 1992 growth plan is to open 95 restaurants (35 Company-owned and 60 franchised) of which 5 Company-owned and 16 franchised restaurants have been opened to date. There are currently 18 Company-owned restaurants and 14 franchised restaurants under construction or in the permitting phase ...

■ These statements are forecasts of future events and the intention of the Company to pursue a particular course, but, by their very language, they cannot be construed as promises. The prospectus also provided the to-date development figures, and investment considerations which focused the market on the variables which would affect the company's ability to succeed in its growth plan. The considerations also included information concerning the competitive nature of the quick-service restaurant industry. See Prospectus at pgs. 7–8 (D–018885–6). Forward-looking statements accompanied by sufficient cautionary language or risk disclosures are immaterial as a matter of law and do not establish 10(b)/10b–5 fraud. *In re Stac Electronics Securities Litigation*, 89 F.3d 1399, 1408 (6th Cir.1996). The prospectus also contained the following cautionary information:

Growth Strategy:

The Company has grown rapidly during the past two years and its strategy is to accelerate development of existing Company and franchise markets. The Company's ability to continue its expansion will depend upon a number of factors, including the availability and cost of suitable locations, the hiring, training, and retaining of skilled management and personnel, the availability of adequate financing, the selection and acceptability of franchisees and other factors, many of which are beyond the control of the Company. There can be no assurance that the Company or its franchisees will be able to continue to open planned new restaurants or that, if opened, these restaurants can be operated profitably.

---

4. A number of alleged misstatements targeted by the plaintiffs predate the class period and are thus beyond the purview of this analysis.

This cautionary language is specific, detailed, and bespeaks sufficient caution with respect to the development plan.

■ Additionally, there is no evidence that the Rally's defendants did not reasonably believe the statements made in the prospectus. The minutes of the July 15, 1992 Group of 12[5] meeting contain no indication that the 1992 development plan could not or would not be achieved. The document indicates that individual market projections were reviewed. A discussion then ensued concerning whether Rally's should move toward a company-driven, a opposed to franchise-driven, development plan. A projection was made that 100 company stores could be developed for the year 1993, with 20 to be built in the first quarter. With regard to franchise development for 1992, progress was discussed, and it was noted that "[w]e need to push ahead aggressively to meet this year's target."

The August 4, 1992 Company Development Report to the board of directors addressed the way in which the 1992 development plan would be achieved, and noted that the key to fast-track openings of new restaurants was the new modular buildings which the company was utilizing.[6] Additionally, development was taking place in the real estate department, with the hiring of seven new employees, and plans to hire three to four more in the next few months.

On October 26, 1992, Albritton, issued a press release which stated that

[d]uring the third quarter, 25 new Rally's restaurants were opened. For the first nine months, 49 new restaurants have been opened and 46 restaurants have been added to the chain through acquisitions. Albritton said, "our plans were to grow the chain by 90 to 95 new stores in 1992, exclusive of acquisitions and we will meet our goal."

Scienter cannot be shown with respect to this statement. The minutes for the September 11–12, 1992 Group of 12 meeting indicate that, per VanDyke's report, franchisees were expected to develop approximately 53 restaurants. Greve reported that the company would construct up to 40 restaurants during 1992. This report indicating the expectation of fewer franchisee restaurants but a greater number of company restaurants for the year would have brought Rally's almost to goal. The fact that the end-of-year figures were, in fact, much lower does not call into question the belief by Albritton in his statement that Rally's would meet their goal. Neither was his remark a misrepresentation, as it was a forward-looking statement rather than a report of historical fact.[7]

---

5. The "Group of 12" was a strategic planning group which met on a bi-monthly basis composed of Sugarman, Wayne M. Albritton, President and Chief Operating Officer of the company, and approximately ten primary officers and department heads. The Group of Twelve meetings usually included Donald Moore, CFO; Klausman; Bruce Ley, Exec. V.P. for Marketing; Kevin R. Greve, V.P. for Real Estate; Guy Van Dyke, Sr. V.P. for Development; William Vivian, Sr. V.P. for Operations; Gary Beisler, V.P. for Franchise Operations; Edward Binzel, Sr. V.P. for Franchise Sales; Larry Smith, V.P. for Training; Scott Wintrow, V.P. for Purchasing and Distribution; and three Regional V.P.s for Operations,

David Mehl, Thomas Pennock, and Rene Prats.

6. Rally's had recently acquired a modular building company.

7. The plaintiffs make much of the fact that Albritton's turn of phrase was "we will meet our goal." This nothing more than a zealous prediction of the future. No market could take that statement as a certainty. It was clearly as definitive a statement as could be made about future events, however, and it was based upon the information from the September meeting that the company was poised to succeed in fulfilling that prediction.

The plaintiffs take issue with the January 28, 1993 press release issued by Albritton, the March 6, 1993 Senior Note Offering prospectus (March 6, 1993), and Rally's 1992 Form 10–K (issued March 31, 1993) which contained similar statements concerning the final opening numbers for 1992 and the expansion strategy for 1993. Albritton's press release stated that

> During the fourth quarter of 1992 we opened 19 new company restaurants and acquired 16 more from our franchisees. In 1992, 81 new Company owned restaurants were opened or acquired. On January 8, 1993, we acquired West Coast Restaurant Enterprises who operated 7 Rally's restaurants, had one restaurant under construction and owned the exclusive rights to develop Rally's restaurants in Los Angeles. These results will provide tremendous momentum going into 1993 where we will open at least 85 new Company owned restaurants exclusive of acquisitions.

The plaintiffs contend that the assertion that Rally's had "tremendous momentum" to carry it into 1993, and that it would "open at least 85 new Company owned restaurants" by year end were false and misleading.

In the very paragraph where the "tremendous momentum" rhetoric appears, Rally's publicized the modest 1992 opening figures. The "tremendous momentum" language, which is non-substantive puffery, is not actionable. *Raab v. General Physics Corp.*, 4 F.3d 286, 289 (4th Cir.1993).

With respect to the forecast for 1993 openings, while the evidence has established that there was some internal debate, the October 30, 1992 report from Van Dyke to the board of directors presented a very optimistic and aggressive internal plan to build 183 company-owned and 87 franchised restaurants. The report detailed the requirements for implementation of such a plan, including the need for additional real estate personnel (which had been in process since August of 1992), use of modular buildings (which had been touted as the key to fast-paced openings, and which was implemented in the second half of 1992), and franchise development (a problem which had been addressed, and company-owned stored had been pushed to the forefront for 1993). It is undisputed that, at the November 14, 1992 board of directors meeting, the board voted to initiate the development of 183 Rally's restaurants during 1993. The public announcement in the January, 1993 press release was a much more conservative forecast than the highly aggressive internal goals sought to be attained.

That there was disagreement over the internal target of 183 stores does nothing to support an inference that the public goal of 85 was not an honest statement of the company's intention and belief that that goal could be achieved. In fact, Van Dyke testified that between October of 1992 and March of 1993, Rally's was successful in quickly hiring real estate people with experience in fast food store development due to some fortuitous timing. Despite setbacks in 1992, the reports of Van Dyke and Greve indicated that Rally's was poised to make great strides in development in 1993. A December 21, 1992 memorandum to the Group of 12 from Greve identified 198 properties for development. Van Dyke testified that the Group of 12 had focused on development potential city-by-city which yielded much larger numbers than by taking a national overview. He testified that Sugarman definitely believed that the internal goal was possible. However, this internal goal was more than double the publicly expressed goal for the year, and thus the issue of whether the internal figure could have been reached is merely academic.

What is clear from the documents is that there was confidence in Rally's optimism at the beginning of 1993 because the company had taken steps to foster growth. The steps for expansion were set out in the October 30 Van Dyke report, the plan for the Senior Bond Offering was in place, and other considerations were being addressed. The plaintiffs' expert opines in hindsight that these efforts were "too little, too late" and that the plan was doomed to fail from its inception. However, this is the sort of "Monday morning quarterbacking" that is not permitted in establishing securities fraud. A corporation and its officers are not liable for stating an honestly held view based on the information currently before them. *See, i.e., Sinay v. Lamson & Sessions Co.,* 948 F.2d 1037, 1040 (6th Cir.1991); *Mayer v. Mylod,* 988 F.2d 635, 638 (6th Cir.1993). The plaintiffs have not shown that management did not honestly believe that the goal could be achieved.

Rally's earnings were down during the first quarter of 1993, which the company attributed in large measure to severe winter weather. Beginning in February of 1993, financial analysts began expressing great skepticism regarding Rally's 1993 development plan. The naysayers included Standard & Poor's, which issued a "B" rating for Rally's Senior Notes; Moody's, which assigned them a BA2 rating; articles in *Forbes Magazine* and *The Wall Street Journal;* and various analysts' forecasts such as opinions from Sheridan and Johnson Rice. The skepticism was expressed consistently and over an extended period of time. (See, Affidavit of Steven J. Aaronoff, Exs. J through P, dated 2/1/93 through 6/26/93). The analysts' criticisms focused specifically on the feasibility of the expansion plan. For example, Moody's Investor's Service Inc. stated on February 1, 1993 that its BA2 rating was "based on intense competition in the restaurant in-dustry, the company's modest size and dramatic expansion plans, a Rally's moderately high leverage ... Moody's believes that the planned annual expansion of more than 80 corporate stores and 60 franchise stores over the next several years will pose significant challenge to this modest-size company ..." Standard & Poor's stated that although Rally's had shown steady growth and had generated returns on capital generally indicative of a higher rating, it downgraded the Notes to a "B" because "S & P believes that this financial performance may be transitory," explaining that the growth rate called for by the plan exceeded 30% and would require high levels of capital. It anticipated that Rally's performance might be hurt by intensifying competition. The *Forbes* and *Wall Street Journal* articles aggressively and thoroughly detailed their criticisms of the expansion plan. The court finds that the public skepticism by the market analysts was sufficiently direct, intense and credible to counteract the zealous optimism of the Rally's defendants.

Finally, the plaintiffs challenge the April 27, 1993 press release revealing the poor first quarter figures, and in which Albritton stated that "[t]he Company now expects to open 105 restaurants in 1993 and its franchisees will open 60 restaurants for a total of 165 new restaurants." The plaintiffs cannot establish scienter with respect to this statement in light of the March 3–4, 1993 minutes of the Group of 12 meeting in which Greve reported that despite problems in the first and second quarters, that Rally's would meet its projections for the third and fourth quarters. In a memorandum to the board of directors dated July 15, 1993, Greve detailed the progress of development, and concluded that "we are projecting 30 new stores for the third quarter and 50 for the fourth

quarter for a total of approximately 105 new company stores for 1993." [8]

 The plaintiffs suggest that certain insider sales of stock which occurred during the class period evidence scienter. In determining whether such sales constitute circumstantial evidence of scienter, the court must consider the amount and percentage of shares sold by insiders, the timing of the sales, and whether the sales were consistent with the insider's prior trading history. *In re Silicon Graphics, Inc. Securities Litigation,* 183 F.3d 970 (9th Cir.1999)(*citing, Provenz v. Miller,* 102 F.3d 1478 (9th Cir.1996)). The largest sale of stock, that of 151,000 shares from November 5–17, 1992 by Patricia Glaser, might raise some suspicion due to the fact that the sale of virtually all of her stock occurred during the class period, although not at the time when she could have achieved the greatest profit. Only three other defendants sold any stock at all, those being Moore (10,000 shares), Klausman (15,000 shares) and Morris (4,500 shares). GIANT GROUP (a 39% shareholder), Sugarman, and Albritton did not sell any shares. Rally's had almost thirteen million shares of stock outstanding at the end of the class period. The comparatively small sales by a number of insiders does not in this instance circumstantially evidence scienter.

### IV.

The plaintiffs have asserted a state law claim of negligent misrepresentation.

They have not addressed the claim specifically in their brief. However, the claim alleges that the market justifiably relied upon defendants' public statements in arriving at a market price for Rally's stock. Count III, ¶ 124. In light of our determination that there was no fraud on the market, this claim must also fail.

### Conclusion

In conclusion, the court finds that the evidence in the record is clear, and we therefore need not defer to the contrary opinions of plaintiffs experts in this case. For the reasons explained above, we conclude that the plaintiffs cannot prove scienter in the statements made by the defendants. Further, we conclude that the extent and nature of the analyst's evaluations of the defendant's statements counterbalanced any misleading effect those statements might have had on the market. For these reasons, summary judgment will be entered in favor of the Rally's defendants and the action will be dismissed by separate order.

---

**8.** The plaintiffs contend that the deposition testimony of Greve that he told Sugarman and Albritton in the Spring of 1993 that their goal could not be achieved should have impelled the defendant's to publically announce that its plan would not succeed. It is apparent from the documents identified above that Greve's discouragement came after a down quarter and was transitory. Both the March and July reports were optimistic, coming on the heels of Sugarman finding that the defeatist attitude was "unacceptable." We do not pass judgment on the management skills or business acumen of Sugarman as those issues are not before us. Rally's has no obligation to report the periodic waning in confidence of any given member of management. *See, ie., In re Burlington Coat Factory Securities Litigation,* 114 F.3d 1410, 1432 (3d Cir.1997).