## In re SEAGATE TECHNOLOGY II SECURITIES LITIGATION.

This Document Relates To All Actions.

No. C–89–2493(A)–VRW.

United States District Court, N.D. California.

Sept. 8, 1992.

---

James A. DiBoise, Mary Anne Rodgers, Thomas E. Moore, III, Wilson, Sonsini, Goodrich & Rosati, A Professional Corp., Palo Alto, Cal., for defendants.

David B. Gold, Paul F. Bennett, Steven O. Sidener, Christopher T. Heffelfinger, David B. Gold, A Professional Law Corp., San Francisco, Cal., William S. Lerach, Eugene Mikolajczyk, Milberg Weiss Bershad Specthrie & Lerach, San Diego, Cal., Arthur Abbey, Abbey & Ellis, New York City, Sherrie R. Savett, Todd S. Collins, Berger & Montague, Philadelphia, Pa., Leonard Barrack, Barrack, Rodos & Bacine, Philadelphia, Pa., Guido Saveri, Saveri & Saveri, San Francisco, Cal., Stuart D. Wechsler, Jonathan M. Plasse, Goodkind, Wechsler, Labaton & Rudoff, New York City, Robert S. Schachter, Robin F. Zwerling, Zwerling, Schachter & Zwerling, New York City, Kenneth H. Hanson, Law Offices of Kenneth H. Hanson, Chicago, Ill., Steven J. Toll, Andrew Friedman, Cohen, Milstead & Hausfeld, Washington, D.C., for plaintiffs and all others similarly situated.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT.

WALKER, District Judge.

This case requires the court to examine the showing required to support a "truth on the market" defense to a federal securities action brought under Rule 10b–5, 17 CFR § 240.10b–5, and premised upon the "fraud on the market" theory. For the reasons stated below, the court holds that summary judgment in favor of defendants asserting a truth on the market defense cannot be granted where the parties' evidence of "what the market knew" consists of competing volumes of contradictory analysts' reports and articles printed in the popular press. Establishment of a truth on the market defense requires a showing that the price of the security was not systematically biased in the same way that proof of a fraud on the market requires proof of such bias.

I.

Seagate manufactures "rigid" (otherwise known as "hard") disk drives for personal computers. Curiously, rigid disk drives are denominated by a "size" which is unrelated

to the actual size of the rigid disk itself. Instead, the "size" of a rigid disk drive is comparable to the size of a floppy disk drive which would fit into the same area in a personal computer chassis. For example, if the rigid disk drive fits into the same space as a floppy disk drive which reads 5¼" floppy disks, the rigid disk drive is a 5¼" "size." Similarly, if the rigid disk drive can fit into the space otherwise used by a disk drive which reads 3½" floppy disks, the rigid disk drive is considered to be a 3½" "size."

It is just this distinction which forms the factual context for this securities fraud lawsuit. In 1988, manufacturers of IBM-compatible personal computers, and IBM itself, began to move from 5¼" floppy disk drives to the 3½" size. Of course, the manufacturers of rigid disk drives, including Seagate, sought to time their switch from the larger sized drive to the smaller to meet the change in market demand. At the time, Seagate maintained a cost advantage over its competitors in the 5¼" model, and embarked on a risky strategy of expanding capacity and aggressively marketing 5¼" disk drives while delaying the company's entry into the more competitive market for 3½" disk drives. In the first six months of 1988, Seagate announced a need to increase production capacity, heavy demand, growing market share and price increases for its products.

In retrospect, Seagate's strategy failed. In July 1988, Seagate announced that net income for the fourth quarter, ending June 30, 1988, had fallen 56%. In August 1988, Seagate disclosed an expected loss for the quarter ending September 30, 1988. On October 26, 1988, Seagate in fact reported a large loss for the quarter ending September 30, and announced inventory write-offs and other charges. Plaintiffs point out

that the price of Seagate's common stock fell precipitously after each of these announcements, and in the aggregate tumbled from around $18 per share just prior to the July 1988 announcement to just above $7 per share following the October 26 disclosure.

## II.

The scope of this case has been significantly narrowed in orders issued before this case was assigned to the undersigned. Seagate now moves for summary judgment on the six alleged misrepresentations which remain in the case.[1] Plaintiffs allege that Seagate's positive announcements prior to October 1988 were materially false and misleading because they failed to disclose: (1) Seagate was suffering from severe excess production capacity, and that such capacity was continuing to expand at a rate well in excess of demand; (2) Seagate had seriously overestimated market demand for its products; (3) Seagate had been increasing its production capacity at the same time that it was reducing per-unit prices in an attempt to increase market share, but that the strategy had backfired, resulting in a reduction in Seagate's net income; (4) Seagate had seriously overestimated demand, and that as a result inventory was swelling rapidly; (5) Seagate had incurred substantial operating losses as a result of its strategy of increasing expansion production capacity ahead of demand and slashing prices and selling near or below cost; and (6) Seagate's plant in Watsonville, California, was not completed when opened, that completion and production of disk drives at the plant was not expected for months and that Seagate had no present plans to fully equip or utilize the plant. Complaint ¶¶ 61(a), 61(b), 61(d), 61(e), 61(m), 61(q).[2]

---

1. Plaintiffs' allegations regarding inadequate reserves and accounting adjustments remain in the case, but are not the subject of the instant motion for summary judgment.

2. The allegation in ¶ 61(b) of the complaint, that Seagate had seriously overestimated market demand for its products, fails to state a claim under the securities laws. Public corporations are under no obligation to disclose internal projections. *In re Convergent Technologies Securi-*

*ties Litigation,* 948 F.2d 507, 516 (9th Cir.1991). To the extent that this allegation seeks disclosure of estimated market demand, Seagate is in no better position to forecast such information than other observers, and therefore, under no obligation to disclose. The alleged nondisclosure of any actions taken by Seagate as a result of the corporation's allegedly erroneous projection of market demand is the subject of four of the remaining five omissions. Accordingly,

Plaintiffs contend that had the market known of these six alleged omissions, Seagate's poor performance would have been anticipated and the price of Seagate's common stock would have reflected this information prior to the announcements which triggered the steep declines in the price of Seagate's common stock. Plaintiffs' theory is that, by failing to disclose the omitted facts, Seagate and the individual defendants in this case perpetrated a "fraud on the market."

Seagate's motion for summary judgment is premised upon a "truth on the market" theory. Admitting, as it must, that the company did not itself disclose the information which plaintiffs allege should have been disclosed prior to October 1988, Seagate supplements its motion with over 50 documents produced and publicly distributed by third parties prior to October 1988 which, according to Seagate, apprised the market of the information not disclosed by the company. Naturally, plaintiffs file in opposition to Seagate's motion a large number of third party documents which indicate that market analysts were "hoodwinked" by Seagate's failure to disclose.

### III.

The fraud on the market theory, seemingly approved by the Supreme Court in *Basic, Inc. v. Levinson*, 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988), is based on the hypothesis that, in a market for securities which is "information efficient," the price of the securities issued by a company is determined by the available material information regarding the company and its business. *Basic*, 485 U.S. at 241, 108 S.Ct. at 988. See also Robert G. Newkirk, *Sufficient Efficiency: Fraud on the Market in the Initial Public Offering Context*, 58 U Chi L Rev 1393, 1396–1400 (1991). Investors transacting in such markets rely generally on the supposition that the market price is validly set and that no unsuspected manipulation has artificially inflated the price. *Blackie v. Barrack*, 524 F.2d 891,

907 (9th Cir.1975). Misleading statements therefore defraud investors who rely on the validity of the market price even if the investors do not directly rely on the misstatements. *Basic*, 485 U.S. at 241–42, 108 S.Ct. at 988–89, citing *Peil v. Speiser*, 806 F.2d 1154, 1160 (3d Cir.1986).

■ The fraud on the market theory does not eliminate the traditional requirements of a securities fraud action brought under Rule 10b–5. Plaintiffs must still prove, inter alia, justifiable reliance, materiality, causation and damages. Under the theory, however, reliance on the misleading statements of the defendant is presumed once the plaintiff proves reliance on the market price. *Basic*, 485 U.S. at 245, 108 S.Ct. at 990.

The theory also subsumes the inquiry into materiality, causation and damages. Generally, an omitted fact is material if there is a substantial likelihood that the disclosure of the fact would have been viewed by a reasonable investor as having significantly altered the "total mix" of information made available. *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). In a fraud on the market case, if an allegedly misleading omission could have no effect on the security's market price, the undisclosed information cannot be material. Similarly, if a statement or omission had no effect on the market price, there can be no causal connection between the statement or omission and an investor's losses, and hence no damages. *In re Verifone Securities Litigation*, 784 F.Supp. 1471, 1479 (N.D.Cal.1992).

The *Basic* Court acknowledged that the presumption raised by the fraud on the market theory could be rebutted by "any showing that severs the link between the alleged misrepresentation and * * * the price received (or paid) by the plaintiff." *Basic*, 485 U.S. at 248, 108 S.Ct. at 992. The Court suggested that if a defendant could show that "market makers" were privy to the truth, and thus that the market

summary judgment is GRANTED in favor of defendants with respect to ¶ 61(b) of the com-

plaint.

price was not affected by the misrepresentations, the causal connection would be broken and the basis for finding that fraud had been transmitted through the market price would be gone. "Similarly, if, despite [a defendant's] allegedly fraudulent attempt to manipulate the market price, news * * * credibly entered the market and dissipated the effects of the misstatements, those who traded * * * would have no direct or indirect connection with the fraud." *Basic,* 485 U.S. at 248–49, 108 S.Ct. at 992.

◼ The Ninth Circuit has embraced this "truth on the market" defense suggested by the *Basic* court. "[I]n a fraud on the market case, the defendant's failure to disclose material information may be excused where that information has been made credibly available to the market by other sources." *In re Apple Computer Securities Litigation,* 886 F.2d 1109, 1115 (9th Cir.1989). It is thus a defense to a lawsuit premised on the fraud on the market theory involving a material omission that the market has become aware of the allegedly concealed information. *Convergent Technologies,* 948 F.2d at 513.

Other circuits have also adopted, at least in theory, the truth on the market defense. *Fine v. American Solar King Corp.,* 919 F.2d 290, 299 (5th Cir.1990) ("The presumption of reliance can be rebutted by showing * * * that the nondisclosures did not affect the market price."); *Wielgos v. Commonwealth Edison Co.,* 892 F.2d 509, 516 (7th Cir.1989) ("Knowledge abroad in the market moderated, likely eliminated, the potential of a dated projection to mislead. It therefore cannot be the basis of liability."); *Peil,* 806 F.2d at 1161 ("The defendants are, of course, free to assert * * * the defense that the market did not respond to the alleged misrepresentations.").

The truth on the market defense has its limits. Scrutiny by the press or by analysts will not ordinarily excuse misleading statements or omissions, and corporations are not relieved of their duty to disclose material information where that information has received inadequate exposure from third party sources. This is because:

the investing public justifiably places heavy reliance on the statements and opinions of corporate insiders. In order to avoid Rule 10b–5 liability, any material information which insiders fail to disclose must be transmitted to the public with a degree of intensity and credibility sufficient to effectively counterbalance any misleading impression created by the insiders' one-sided representations.

*Apple Computer,* 886 F.2d at 1116. With this language, the *Apple Computer* court emphasized that even where information does seep into the market from third party sources, a confirming announcement from the company itself, or the absence thereof, may be "viewed by a reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Industries,* 426 U.S. at 449, 96 S.Ct. at 2132. The truth on the market defense can only be sustained where the corrective statements are shown to have *"credibly* entered the market." *Apple Computer,* 886 F.2d at 1116, citing *Basic,* 485 U.S. at 249, 108 S.Ct. at 992 (emphasis added).

### IV.

◼ Despite its volume, Seagate's evidence fails to establish that the information to which plaintiffs point credibly entered the market through third party sources. To the contrary, the documents submitted by Seagate and by plaintiffs do not negate existence of a triable issue of fact whether the alleged omissions were available to the market.

The documents submitted highlight the evidentiary burden imposed on a defendant relying on the truth on the market defense. Seagate submits news reports and opinion articles which appeared in such publications as *Business Week, P.C. Magazine, Investor's Daily, Fortune,* the *Wall Street Journal,* the *San Jose Mercury News,* the *San Francisco Examiner,* and the *New York Times,* among others. Undoubtedly, these are well respected publications which provide investors much useful information. But in light of plaintiffs' contradictory evidence, it cannot be said that the information contained in these reputable publications *credibly* reached the market, notwith-

standing the testimony of Seagate's expert. Indeed, the news reports and opinion articles introduced by plaintiffs appeared in some of the same publications, including the *Wall Street Journal*, and other, equally respected publications, such as the *San Francisco Chronicle, Barrons*, and the *Dow Jones News Wire*. Similarly, while Seagate presents reports from respected analysts such as First Boston, Hambrecht & Quist, and Montgomery Securities, plaintiffs submit contrary analysis from the equally well-regarded Merrill Lynch.

It should not be surprising that Seagate and plaintiffs could each uncover public documents which support their contentions. The fraud on the market theory, and the economic and financial theories which support the legal doctrine, presuppose that various market participants possess varied amounts of sometimes contradictory knowledge. Richard A. Brealey and Stewart C. Myers, *Principles of Corporate Finance* 300–01 (McGraw–Hill, 4th ed 1991).

Seagate seeks to distinguish the content of the third party accounts presented by Seagate from that contained in plaintiffs' evidence, and contends that the market "knew" of the *risks* associated with Seagate's strategy. Plaintiffs, by contrast, assert that knowledge of the risk is not at issue and what never reached the market, either via Seagate or the third party sources, is the *fact* that Seagate's risky strategy had already failed before Seagate so reported in October 1988. However, even if so distinguished, the documents are ambiguous. Some of the documents which Seagate relies upon to demonstrate that the market knew that Seagate had embarked on a risky strategy indicate that the strategy appeared to be succeeding. And some of the documents submitted by plaintiffs to demonstrate the market's lack of knowledge in fact describe the risks attendant in Seagate's business. The evidence taken as a whole provides no basis to determine what information credibly entered the market, and shows merely what individual market observers knew.

The court's conclusion should not be taken to suggest that a defendant asserting a truth on the market defense can never prevail on summary judgment. In *Apple Computer*, the court examined twenty news accounts wherein the defendants' over-optimistic statements were challenged with the very facts which plaintiffs claim were not disclosed. The court concluded from these documents alone that "the market could not have been made more aware" of the allegedly omitted information. *Apple Computer*, 886 F.2d at 1116. Similarly, the *Convergent Technologies* court considered more than 60 analysts reports and articles before concluding that "there can be no doubt that the market was aware" of the alleged omissions. *Convergent Technologies*, 948 F.2d at 513.

Because individual market participants inevitably possess different, and sometimes inconsistent, information, a court should not readily infer truth or its absence from widespread beliefs among those participants. Markets may often be wrong and every individual market participant will surely at some times be wrong. Rule 10b–5 does not make these errors actionable. Nor when the market participants are right does it follow necessarily that the rule has been honored. Instead, in the fraud on the market context, the rule prohibits an omission or misstatement which systematically biases the price of a security on an open and developed market.

The price of a security is considered unbiased when the amount and direction of any error in the price is random. Newkirk, 58 U Chi L Rev at 1410. This does not mean that the price of the security will at all times reflect its "true value." For example, if the price which would generate a return commensurate with the riskiness of the security is $100, the market price may without any fraud whatever be $120, or $80, or even $200, due to differences in analysts' methodologies or to human inability to forecast the future. Nonetheless, over time (and over a large group of analysts), the average differences between the security's trading price and its appropriate price would approach zero. *Id.* at 1410–11. However, the price of a security is considered systematically biased when omissions or misstatements cause a consistent, non-

random under or over valuation of the security's market price.

When, as in *Apple Computer* and *Convergent Technologies*, courts can with the level of confidence required by FRCP 56 find no reasonable possibility of systematic bias by examining certain news accounts, analyst reports or other such evidence, a truth on the market defense may be appropriate. Where such evidence is not so persuasive, as here, a defendant must attempt a more convincing demonstration that the misstatements or omissions alleged did not bias the market. Such demonstration may take the form of a time event or comparable index study, both of which are commonly used in securities fraud cases. Just as the fraud on the market theory itself subsumes the inquiry into reliance, materiality, causation and damages, so too the truth on the market defense telescopes the traditional view of materiality, causation and damages as separate elements of a securities fraud case. Proof of investors' losses or the lack thereof, in the form of a comparison between the actual market price of a security and its expected unbiased price, necessarily provides credible evidence whether the alleged omissions could have been material.

Hence, this order should not be read as concluding that Seagate is incapable of compiling its evidence in such a way as to prevail on summary judgment in this case. Similarly, plaintiffs' prospects of prevailing on summary judgment in this case are not diminished by this order. Although the contradictory news accounts cannot establish what the market knew, either party might still be able to demonstrate whether the nondisclosures systematically affected the market price of Seagate common stock. The hard data available, in the form of Seagate's stock price and comparable stock price indices, should probably be conclusive with respect to the remaining issues in this case. For these reasons, Seagate's motion for summary judgment is DENIED WITHOUT PREJUDICE.

## V.

■ That said, the court can resolve as a matter of law two issues raised by the parties in connection with Seagate's summary judgment motion. First, plaintiffs incorrectly contend that "the precipitous drop in the price of Seagate stock * * * alone establishes materiality." As discussed above, under the fraud on the market theory a significant change in the market price of a security is a necessary element in a case where plaintiff alleges a misleading omission, for if there is no difference between the market price before and after disclosure of the omitted information, that information cannot be material. *Flamm v. Eberstadt*, 814 F.2d 1169, 1179–80 (7th Cir.1987). However, a change in market price is not sufficient by itself to establish materiality, because the change in price may be caused by new information.[3] Brealey and Myers, *Principles of Corporate Finance* at 294.

■ Second, plaintiffs contend that Seagate's Chairman, Mr. Shugart, made misleading public disclosures in order to inflate the market price of Seagate's common stock. Seagate attempts to disprove this contention by introducing evidence that Seagate's stock price actually declined the day after each allegedly inflating statement. But the direction of stock price movement by itself does not establish whether the statements had an inflating influence on the stock price. One can easily imagine that the market price for Seagate common stock would have fallen even further on those days but for Mr. Shugart's allegedly misleading statements. The issue is the *magnitude* of the price change, and the measure of the price change relative to the unbiased price which would have prevailed in the absence of Mr. Shugart's statements. This Seagate has not even attempted to show.

---

**3.** For example, imagine a simple game where the player receives $1 if a balanced coin turns up heads but $0 if the coin turns up tails. Until the coin is flipped, the value of a turn is $0.50. However, once the coin is flipped, and lies on the ground tails up, the game's value has fallen to zero. The "precipitous drop in value" is due not to any omission prior to the coin flip, but to new information.

## VI.

Seagate's motion for summary judgment is GRANTED with respect to ¶ 61(b) of the complaint, and in all other respects DENIED WITHOUT PREJUDICE.[4]

IT IS SO ORDERED.

**4.** Plaintiffs' motion for class certification is premature and hence DENIED WITHOUT PREJU-

