In re SYNERGEN, INC. SECURITIES
LITIGATION.

No. Civ. A. 93–B–402.

United States District Court,
D. Colorado.

Sept. 15, 1994.

See also 154 F.R.D. 265.

Gerald L. Bader, Renee B. Taylor, Bader & Villanueva, Denver, CO, Robert P. Frutkin, Barbara A. Podell, Savett Frutkin Podell & Ryan, P.C., Sherrie R. Savett, Carole A. Broderick, Berger & Montague, P.C., Philadelphia, PA, for plaintiffs.

Nancy J. Gegenheimer, Edwin P. Aro, Holme Roberts & Owen, Denver, CO, Michael R. Griffinger, Crummy, Del Deo, Dolan, Griffinger & Vecchione, Newark, NJ, Boris Feldman, Bruce Vanyo, Wilson, Sonsini, Goodrich & Rosati, Palo Alto, CA, for defendants.

## MEMORANDUM OPINION AND ORDER

BABCOCK, District Judge.

Defendants Synergen, Inc. (Synergen), Jon Saxe, Kenneth Collins, Larry Soll, and Michael A. Catalano (collectively the defendants) move pursuant to Fed.R.Civ.P. 12(b)(6) to dismiss plaintiffs' consolidated amended class action complaint (the complaint) or, alternatively, for summary judgment under Fed.R.Civ.P. 56. Because the parties present materials outside the pleadings to support their positions, the defendants' motion is treated as one for summary judgment. The motion is exhaustively briefed and orally argued. For all the reasons set forth below, the motion will be denied.

I.

Plaintiffs allege that Synergen and certain directors and officers (the individual defendants) defrauded investors in violation of § 10(b) of the Securities Exchange Act of 1934 (§ 10(b)), 15 U.S.C. § 78j(b), and Rule 10b–5 of the Securities and Exchange Commission (Rule 10b–5), 17 C.F.R. § 240.10b–5. Plaintiffs also seek to hold the individual defendants liable for the alleged misstatements and omissions under § 20(a) of the Securities Exchange Act of 1934 (§ 20(a)), 15 U.S.C. § 78t(a). These claims have been certified as class action claims with the class period beginning on November 7, 1991 and ending February 19, 1993 (the class period).

Synergen is a biopharmaceutical company engaged in the discovery, development and manufacture of protein-based pharmaceuticals. Plaintiffs' exh. 178. The individual defendants are: Jon Saxe (Saxe), Synergen's president and chief executive during the class period; Kenneth Collins (Collins), vice president of finance and administration from January, 1992 to the end of the class period; Michael A. Catalano (Catalano), vice president of clinical research throughout the class period, and; Larry Soll (Soll), chairman of the board of directors and Synergen consultant during the class period.

Plaintiffs' complaint alleges that these defendants misrepresented or concealed material facts concerning: 1) the studies of the effect of Antril in septic animals; 2) the Phase II clinical trial of Antril in patients with sepsis; and 3) the number and characteristics of septic patients that Antril "will treat". Complaint, ¶ 15. The defendants move for summary judgment on the grounds that: 1) they did not make any misrepresentations which are actionable under § 10b or Rule 10b–5; 2) they did not act with fraudulent scienter; 3) the market recognized the risks of investing in Synergen; and 4) the individual defendants are not liable.

II.

Summary judgment shall enter where there is no genuine issue as to any material fact and the moving party is entitled to judg-

ment as a matter of law. Fed.R.Civ.P. 56(c). If a movant establishes entitlement to judgment as a matter of law given uncontroverted facts contained in the documentary evidence, summary judgment will lie. *Mares v. ConAgra Poultry Co., Inc.,* 971 F.2d 492, 494 (10th Cir.1992). The operative inquiry is whether, based on all the documents submitted, a reasonable trier of fact could find by a preponderance of the evidence that the plaintiff is entitled to a verdict. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); *Mares,* 971 F.2d at 494. Summary judgment should not enter if, viewing the evidence in a light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor, a reasonable jury could return a verdict for that party. *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512; *Mares,* 971 F.2d at 494.

### III.

Analysis of the defendants' motion entails an understanding of: 1) the medical condition of sepsis; 2) Synergen's development of Antril; 3) Synergen's anticipation of Antril's efficacy in the treatment of sepsis; 4) the Food and Drug Administration's (FDA) drug approval process; 5) the testing and effect of Antril on septic animals; and 6) the testing and effect of Antril in Phases I, II and III of the FDA approval process on humans. I consider the defendants' statements made throughout the class period concerning Antril's effect on animals and human patients in light of this background and the information they possessed or lacked when these statements were made.

I now turn to the facts, drawing all reasonable inferences in plaintiffs' favor. Sepsis is a complex illness in which systemic inflammation affects cells throughout the body. Declaration of John P. Pribble (Pribble), ¶ 3. This disease affects approximately 500,000 people in the United States each year. *Id.* Sepsis occurs when the immune system goes awry in fighting severe infection. Id. at ¶ 4. There are two types of sepsis: 1) sepsis syndrome, which is sepsis accompanied by clinical evidence of impaired organ function; and 2) septic shock, which is sepsis syndrome

accompanied by significant reductions in blood pressure (hypotension). Plaintiffs' exh. 5. Sepsis is caused by diverse types of infections. Declaration of Scott Manaker (Manaker), ¶ 4. In most cases, bacterial infections cause sepsis. *Id.* at ¶ 6. Bacterial infections generally fall into one of two categories: gram-negative or gram-positive bacteria. *Id.* In the remaining cases, the infecting agent is viral, fungal or parasitic. *Id.*

The mortality rate for sepsis patients is high at approximately 40% and varies greatly. Pribble at ¶ 3; Manaker at ¶ 9. The principal mortality risk determinants include severity of the patient's condition, age, underlying disease(s), and presence of organ failure. Manaker at ¶ 9. Since death in sepsis syndrome patients may be caused by underlying conditions other than sepsis, the measurement of a drug's effect on reducing mortality from sepsis syndrome is more uncertain than establishing a drug's effect on patients with a single condition. *Id.* at ¶ 8. Imbalances in patient characteristics between drug-treated patients and patients receiving a placebo may also skew clinical trial results because the trial's results may be due to the imbalances rather than the drug. *Id.* at ¶ 9.

Currently, there is no approved sepsis treatment in the United States other than standard supportive care such as antibiotics. Pribble, ¶ 3; Manaker, ¶ 5. In 1990, Synergen announced that it had successfully produced recombinant human IL–1ra, which came to be called Antril. Pribble, ¶ 6. The first FDA approved drug for the treatment of a disease has a marked competitive advantage over subsequently approved drugs. Manaker, ¶ 3. Doctors become accustomed to using the drug, and are unlikely to switch to a subsequently approved drug unless the latter drug has appreciably better therapeutic advantages, a better side effect profile, will treat a wider spectrum of patients, or has cost advantages. *Id.*

In addition to Synergen, other biotechnology companies including Centocor, Xoma and Bayer/Chiron were developing drugs to treat sepsis. Preston, ¶ 14; Saxe Tr. 182. Saxe believed that either Xoma, Centocor, or Bayer would bring its sepsis drug to market

before Synergen because two or three of those companies had initiated their clinical evaluations before Synergen. Saxe Tr. 183. However, unlike Antril, Centocor's and Xoma's drugs were limited to treating sepsis caused by gram-negative bacteria only. Saxe Tr. 184. Thus, development of a drug effective in treating sepsis caused by gram-positive bacteria would establish market advantage.

The first step in obtaining FDA approval for a new drug is testing the drug in animals in which the condition to be treated is induced. The animal studies are then used to file an investigational new drug application (IND). Declaration of Robert Makuch, (Makuch) ¶ 10. If the drug appears to have any treatment effect in animals, coupled with a rational basis to explain the result, the FDA will permit safety testing in humans (Phase I). Deposition of Charles A. Dinarello, M.D. (Dinarello Tr.) 134–135. In Phase I, the drug is tested for safety. Dinarello Tr. 135. If successful, that trial may be followed by a Phase II trial in which varying dosages may be tested, along with the efficacy of the drug. *See* Plaintiffs' exh. 192, p. 5. That trial is followed by Phase III, the efficacy test. Dinarello Tr. 135.

### a) Animal Studies

Studies of IL–1ra were conducted in mice, rats, rabbits and baboons in which septic shock was induced by infusing relatively large quantities of bacteria. No studies were conducted on animals absent septic shock. In all but one of these studies the animals were infused with gram-negative bacteria or the endotoxin component of gram-negative bacteria. In three of the gram-negative studies, in infant rats, baboons, and burned rats, Antril had either no effect or a detrimental effect. Plaintiffs' exhs. 9 and 183. In the infant rat study, higher doses of Antril actually increased mortality. Defs' exhs. 14 and 15. In the baboon study, Antril had no treatment effect on septic baboons who were infused with sublethal does of bacteria. Plaintiffs' exh. 183. Similarly, Antril had no treatment effect in a study of septic rats who were immunocompromised due to burns over thirty percent of their bodies. Plaintiffs' exh. 9 at SYN072528.

In June 1992, Synergen attempted to replicate some of the animal trials so as to determine whether IL–1ra produced at a new factory had the same qualities as IL–1ra used previously. Plaintiffs' exh. 17 at SYN260957. Synergen could not replicate any previous preclinical trial with mice. By October, 1992, the search for a workable animal model had resulted "in a large number of frustrating experiments", plaintiff's exh. 19 at SYN259286, and no confirmation of dose dependent protection.

### b) Phase I

Nevertheless, based on the results of in vitro and animal experiments involving IL–1ra, Synergen sought and obtained FDA approval to test Antril in humans. *Id.* Synergen submitted laboratory and animal testing data to the FDA before commencing the Phase I trial. *Id.* The Phase I safety trial was done in healthy volunteers. Plaintiffs' exh. 7. The results allowed Synergen to proceed to Phase II.

### c) Phase II

Patients were enrolled in the Phase II study between April 29 and August 23, 1991. Pribble, ¶ 14. This trial consisted of ninety-nine patients. *Id.* at ¶ 11. The patients were divided randomly into four groups, known as the trial "arms". *Id.* Twenty-five patients received a placebo. The remaining patients were divided into three groups; one received a low dose of Antril, another received a medium dose, and a third received a high dose. Plaintiffs' exh. 192, p. 4. The trial was an open-label trial, *Id.*, in that the treating physician knew whether the patient received a placebo or the drug, and the drug dosage. Among other things, the trial sought to determine whether:

a) IL–1ra decreases the 28–day all cause mortality in patients with sepsis with or without shock;

b) IL–1ra decreases the prevalence and/or improves the resolution of organ failure in septic patients; and,

c) IL–1ra demonstrates a dose-response relationship relative to safety and/or efficacy.

*Id.* at 5. In the placebo group, 11 of the 25 patients died. In the low dose group 8 of 25 patients died. In the mid-dose group 6 of 24 patient died. In the high dose group 4 of the 25 patients died. Thus, the 28–day mortality rate of patients in the groups treated with Antril in the Phase II trial was less than the mortality rate of patients who received a placebo. Pribble, ¶ 15. Additionally, the mortality rate of patients who received the high dose of Antril was lower than the mortality rate of the patients in the low and mid-dose groups. *Id.*

### d) Phase III Trial

After reviewing the Phase II results and the Phase III protocol, the FDA authorized Synergen to proceed with Phase III. Pribble, ¶ 24. It involved 893 patients. *Id.* at ¶ 25. The patients were divided into three arms of approximately 300 patients each: placebo, low-dose, and high-dose. *Id.* The Phase III trial was "double-blinded", meaning that the doctor, the patient, and Synergen did not know whether a patient was receiving drug or placebo. *Id.* Only the Maryland Medical Research Institute held the electronic key to unblind the codes. *Id.* Phase III enrollment took place from March 16 through November 9, 1992. In November, 1992, Pribble typed an analysis of overall mortality data in the Phase III trial. Plaintiffs' exh. 39. Catalano was given this document and Soll had a copy of it in his files. Pribble Tr. 325–26; Plaintiffs' exh. 40. The blinded analysis indicated that 32 percent of the first 821 patients enrolled in the trial had died during treatment. Thus, by November, 1992, one could reasonably infer that either the placebo or the treated patient group mortality was higher in Phase III than Phase II.

In a December 17, 1992 telephone conference with the FDA, Dr. Jay Seigal, the FDA clinical evaluator, suggested that Synergen amend its protocol to analyze mortality in patients with shock. Plaintiffs' exh. 41 at SYN104811. At Synergen's internal meetings, they had already planned to propose this amendment to the FDA. *Id.* However, it was "clear that this [was] a secondary

endpoint and would not, by itself, constitute approvability." *Id.* Synergen submitted the revised protocol to the FDA on January 6, 1993. Plaintiffs' exh. 42. In it, Synergen states:

An analysis of the data from the Phase II trial ... showed a strong dose-related reduction in mortality for the shock group and a nonsignificant result for the non-shock group (there were only 34 patients in the latter group). This result suggests an interaction between treatment and the presence or absence of shock.

*Id.*

On February 19, 1993, the Phase III testing code was released to Synergen, revealing the unblinded Phase III results. These results disclosed that at most, Antril might benefit more severely ill patients. See Pribble, ¶¶ 27 and 28. However, because Synergen had not predicted this relationship before unblinding the data, the relationship could not satisfy the FDA's statistical criteria for drug approval. *See generally,* Defs' exh. 7. On the following business day, Synergen issued a press release disclosing the Phase III results. Pribble, ¶ 28. Synergen's common stock market price dropped significantly on that date. Declaration of Candace L. Preston (Preston), ¶ 43.

### e) The alleged misrepresentations or omissions

1) At "road shows" during the class period, the individual defendants made presentations concerning the Phase II results. In particular, the evidence is sufficient for a reasonable jury to infer that Catalano and Saxe stated on separate occasions to investors: "[t]he attractiveness of Antril in this severe, life threatening condition is that it *will* treat *all* patients with sepsis syndrome, *regardless of whether or not their infection is gram negative or gram positive".* Plaintiffs' exhs. 49, 50, and 52. At other road show presentations, the script read: "The attractiveness of Antril in this life threatening condition is that it *will* treat *all* patients with sepsis syndrome, *regardless of their underlying infection".* *See, e.g.,* Plaintiffs' exh. 54 at SYN235064—Prudential Security Health

Care Conference—January 28, 1992; Plaintiffs' exh. 55 at SYN234989—Paine Webber European Health Care Conference—February 5–6, 1992; Plaintiffs' exh. 69—7th Annual Cowen Emerging Health Care Conference. Debra Bannister, Synergen's director of corporate communications stated that Soll gave investor presentations concerning Antril on more than one occasion. Deposition of Debra Bannister (Bannister Tr.) 34–35. She further stated that Collins, like Soll, made a presentation at the Hannefin Imhoff winter conference which generally followed the road show script. Bannister Tr. 35–36. Similarly, according to Bannister, Catalano made road show presentations on more than one occasion. Bannister Tr. 32–33. This statement, in a slightly varied form, was also included in Synergen's 1992 third quarter report (1992 Report), signed by Saxe and Soll. It states:

> [Dr. Opal] presented data for the first time from the Phase II trial that demonstrated a dose-dependent survival advantage in sepsis syndrome patients treated with ANTRIL regardless of the source or type of infecting organism. These patients had gram negative or gram positive bacterial infections, or infections caused by other organisms.

Plaintiffs' exh. 201 at DW03441–42. As further evidence of misrepresentations concerning the treatment of all sepsis patients, the plaintiffs refer to the 1992 Report discussing the Phase II trial in which it states: "The dose-dependent treatment benefitted patients both in shock and not in shock". Plaintiffs' exh. 201 at DW03442. Viewing the evidence in a light most favorable to the plaintiffs and drawing all reasonable inferences in their favor, a reasonable jury could conclude that each of the individual defendants stated to investors during the class period that Antril *will* treat *all* patients with sepsis syndrome, *regardless of their underlying infection.*

The plaintiffs contend that these statements are false or misleading because the Phase II results had not proven that Antril will treat both shock and non-shock patients or patients with any infection other than gram-negative. Antril's efficacy in treatment of all such patients would have rendered it

superior to the anti-sepsis drugs being developed by other companies. Consequently, Synergen would have had a clear competitive advantage in the market.

2) Next, the plaintiffs contend that Synergen's media advisory (the advisory) dated November 7, 1991 contains misrepresentations. This advisory informed the media of the preliminary Phase II results. It states: "Baseline characteristics were similar among treatment groups." Plaintiffs' exh. 30.

3) The third allegedly false or misleading statement addressed in depth here also appeared in the advisory. It reads: "Survival was demonstrated to be a linear function of dose at the $p = 0.015$ level". *Id.*

## IV.

Section 10(b) of the Securities and Exchange Act of 1934 prohibits the use "in connection with the purchase or sale of any security ... [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary." 15 U.S.C. § 78j(b). Pursuant to this section, the Securities and Exchange Commission (SEC) promulgated Rule 10b–5, which provides, in relevant part:

> It shall be unlawful for any person ...
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading ...
>
> in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

Under a misrepresentation or omission theory, a plaintiff can establish § 10(b) and Rule 10b–5 liability by showing that: 1) in connection with the purchase or sale of a security, the defendant made an untrue statement of a material fact or failed to state a material fact; 2) in so doing, the defendant acted knowingly with intent to deceive or defraud; and 3) plaintiff relied on the misrepresentations sustaining damages as a proximate result of the misrepresentations. *O'Connor v. R.F. Lafferty & Co., Inc.,* 965

F.2d 893, 897 (10th Cir.1992). Thus, a person can be liable for either material misrepresentations or material omissions in connection with the purchase or sale of securities. *Jensen v. Kimble,* 1 F.3d 1073, 1077 (10th Cir.1993). In this case, plaintiffs assert that defendants are liable for material misrepresentations and omissions.

### A.

The defendants first argue that there is no genuine issue they ever made misrepresentations. Specifically, they contend they never represented that the Phase II trial (or anything else for that matter) had proven Antril effective. I disagree. The plaintiffs have met their summary judgment burden.

■ In determining whether a statement is actionable, I must scrutinize the nature of the statement to determine whether it was false when made. *In re Storage Technology Corp. Securities Litigation,* 147 F.R.D. 232, 237 (D.Colo.1993). I look to whether the representation suggested reliability, bespoke caution, was made in good faith, or had a sound factual or historical basis. *Id.*

■ The defendants refer to Synergen's December 1991 common stock offering (the prospectus) to show that their statements fail to support a securities fraud claim. In relevant part, it reads:

Synergen scientists ... have shown [Antril] to be effective in animal models of several diseases, including sepsis syndrome.... Although results of such models have shown efficacy in animals, there is no assurance that clinical trials will demonstrate effectiveness in humans. Human testing of Antril ... suggests that Antril may be an effective treatment for sepsis syndrome ...

Although the [Phase II] trial was not designed to include a sufficient number of patients to demonstrate statistically significant clinical efficacy, Antril reduced mortality in the sepsis syndrome patients tested. Synergen plans to conduct Phase III clinical trials designed to determine clinical efficacy in a larger patient group in 1992.

Defendants' exh. 10. Several pages earlier, the prospectus reads:

There is no assurance that Synergen's products will be effective, capable of manufacture in commercial quantities, approved by appropriate regulatory authorities or accepted by the marketplace.

In response, plaintiffs present evidence that defendants stated to investors during the class period that Antril *will* treat *all* patients with sepsis syndrome, *regardless of their underlying infection.* In contrast to the prospectus, no cautionary language accompanied these statements. In light of these representations, a reasonable jury could infer that an investor would discount or ignore the cautionary prospectus language and believe Antril had, in fact, proven effective in the Phase II trial. In addition, the 1992 third quarterly report could also be construed by a reasonable jury as representing that the Phase II trial had proven Antril effective in treating all sepsis patients, those with and without shock, regardless of their underlying infection. Accordingly, a genuine issue exists whether defendants represented that the Phase II trial had proven Antril effective.

■ Applying what has come to be labeled the "bespeaks caution" doctrine, defendants argue no misrepresentations were made because Synergen and its outside consultants repeatedly emphasized that the Phase II trial had not proven Antril effective. Forecasts, projections, and expectations made with adequate cautionary language are not actionable as securities fraud. *Storage Technology,* 147 F.R.D. at 237. The "bespeaks caution" doctrine has developed to address situations in which optimistic projections are coupled with cautionary language—in particular, relevant specific facts or assumptions—affecting the reasonableness of the reliance on and the materiality of those projections. *Rubinstein v. Collins,* 20 F.3d 160, 167 (5th Cir.1994). However, the mere presence of some cautionary language does not in and of itself neutralize untrue or misleading statements as a matter of law. *See generally Mayer v. Mylod,* 988 F.2d 635, 639 (6th Cir.1993).

This case concerns representations as to current and historical facts concerning the Phase II clinical trial, not projections of fu-

ture company performance. Thus, the "bespeaks caution" doctrine is inapplicable here. The defendants offer no legal precedent for extending this doctrine absent projections of future events. Similarly, no legal authority supports the extension of this doctrine to statements issued without cautionary remarks. Accordingly, I cannot conclude as a matter of law that the prospectus warnings given concerning the Phase II trial are alone sufficient to preclude liability here.

## B.

Next, the defendants argue that Synergen never represented that the patients in each arm of the study were identical. However, the plaintiffs neither allege nor argue that the treatment arms were identical. Instead, they allege the defendants misrepresented a material fact by stating: "[b]aseline characteristics were similar among treatment groups".

Defendants further assert that this statement was not misleading because the differences between the arms were not statistically significant and because Synergen presented to scientists and the financial community those characteristics which rendered the treatment groups similar i.e. age, gender, and Apache II score. Although the statistical mean and standard deviations for those characteristics by group along with the measure of statistical significant (the p-value) for the variations across the four arms was disclosed on at least two occasions, it was not disclosed in the advisory. Similarly, the advisory did not state that the differences among the arms with respect to those demographic characteristics were not statistically significant.

The plaintiffs also present evidence of the Phase II entry criteria which specified in part that patients should be excluded if they had an underlying disease which was expected to be rapidly fatal or they were immunocompromised, had a history of severe heart, liver, or renal failure, were pregnant, or were post-organ or bone marrow transplant. Plaintiffs' exh. 192, pp. 7–8. Notwithstanding these requirements, one placebo patient had an inoperable dead bowel and another 79–year–old placebo patient had gastric cancer, which conditions are invariably fatal within a short course. Plaintiffs' exh. A and D, Vol. I; Manaker, ¶ 18. In addition, a 69–year–old, low-dose patient was brain dead when he entered the trial, having had cardiac arrest the day before. Plaintiffs' exh. C, Vol. I; Manaker, ¶ 18.

As for organ dysfunction imbalances among the arms, it is significant that the number of patients with organ failures and the numbers of organ failures per patient was higher in the placebo group than in the high dose group. Plaintiffs' exh. 27 at SYN081899; Id. at 081886–87. There were also fewer organ failures in the low and medium dose groups than in the placebo group, but more organ failures than in the high dose group. Id. While these numbers are undisputed, the parties present conflicting evidence requiring a jury's resolution as to the statistical significance of these imbalances on the Phase II results.

At an April, 1992 meeting of Synergen's Product and Project Review Committee (PPRC), a presentation was made detailing the imbalances in the four treatment groups in the Phase II trial. Deposition of Jon Saxe (Saxe Tr.) 70–72; Deposition of David Forrester Carmichael (Carmichael Tr.) 18–19; Plaintiffs' exhs. 24, 25, 26. At the meeting, attended by all of the individual defendants, the Phase II trial results were summarized. Plaintiffs' exh. 26. In addition, Synergen's biostatistician, John Lebrecque, informed the group that:

> Another covariate examined was the number of patients with organ dysfunction at entry. Organ dysfunction was defined as one or more of following: ARDS, DIC, liver dysfunction or renal dysfunction. "Normalizing" for these covariates would bring the level of significance of the outcome by dose effect seen in the Phase II results to an unacceptable $p = 0.062$ from $p = 0.035$.

Id. Statistical significance measures the likelihood that a result is due to random chance rather than the effect for which one is testing. Declaration of John Lebrecque, ¶ 5. A p-value of 0.05 or less renders the results statistically significant. Id. In Catalano's

April 21, 1992 report to the Board, including Saxe and Soll, he stated:

> The data from the phase II trial suggested that the placebo patients may have had more severe sepsis than the three active treatment groups, as measured by Apache II scores and presence of major organ dysfunction; of the four groups, the high-dose group was the least severe by these two important parameters. None of these differences was statistically significant for the small sample sizes.

Plaintiffs' exh. 28 at SYN35451. Subsequently, in the final Phase II integrated report published December 17, 1993, Synergen acknowledged that "[t]he presence of organ dysfunction has historically been used as a measure of disease severity for sepsis patients." Plaintiffs' exh. 90 at SX001784. It further stated: "[T]he treatment groups may be somewhat imbalanced with respect to the presence or absence of organ dysfunction at study entry, but not statistically so $(p>0.2)$ .... even adjusted for [organ dysfunction], the level of dose is still a statistically significant predictor of survival." *Id.*

Turning to the presence of serious underlying disease, the placebo patients were also sicker by this measure than the other arms. Plaintiffs' exh. 36 at SYN046130. Additionally, the average age of the high-dose patients was lower than the remaining patients, and there was a lower incidence of gram-negative bacteremia in the high-dose group. Plaintiffs' exhs. 26 and 27 at SYN081890. Taken together and drawing all reasonable inferences in the plaintiffs' favor, a reasonable jury could conclude from this evidence that baseline characteristics of the patients in the various treatment groups were dissimilar, not similar. Accordingly, whether defendants misrepresented the patient characteristics in the Phase II trial is a question which must be resolved by the trier of fact.

### C.

Defendants argue that their "baseline characteristics" statements were not rendered materially misleading by omission. They limit their "materiality of omissions argument" to the baseline characteristics statements. Specifically, they assert the differences in severity among the trial arms was not significant and did not skew the trial results. Reply, p. 8. However, the plaintiffs present evidence to show a genuine issue exists as to whether certain omissions relating to patient characteristics render these statements materially misleading.

The Supreme Court defined the standard for materiality of omissions under the securities laws, *see TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976), concluding in the proxy-solicitation context that: "[a]n omitted fact is material if there is a substantial likelihood a reasonable shareholder would consider it important in deciding how to vote." *Id.* at 449, 96 S.Ct. at 2132. It further explained that to fulfill the materiality requirement there must be a substantial likelihood the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available. *Id.* at 449, 96 S.Ct. at 2132. In *Basic Inc. v. Levinson,* 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988), the Court expressly adopted the *TSC Industries* standard of materiality for § 10(b) and Rule 10b-5 cases. *See also Garcia v. Cordova,* 930 F.2d 826, 829 n. 1 (10th Cir.1991) (the standard set forth in *TSC Industries* addressing materiality under Rule 14a-3 is equally applicable in § 10(b) and Rule 10b-5 cases). Accordingly, I apply the *TSC Industries* materiality standard.

The issue of materiality may be characterized as a mixed question of law and fact because it involves the application of a legal standard to a particular set of facts. *TSC Indus.,* 426 U.S. at 450, 96 S.Ct. at 2133. In considering whether summary judgment on the issue is appropriate, I must keep in mind that the underlying objective facts, which may be free from dispute, are merely the starting point for the ultimate determination of materiality. *Id.* The determination requires delicate assessments of the inferences a reasonable shareholder/investor would draw from a given set of facts and the significance of those inferences to that shareholder. *Id.* These assessments are peculiarly ones for the trier of fact. *Id.* Only if the established omissions are so obviously important

[or unimportant] to a reasonable shareholder/investor that reasonable minds cannot differ on the question of materiality is the ultimate issue of materiality appropriately resolved as a matter of law by summary judgment. *Id.* Furthermore, an omission is actionable under the securities laws only when there is a duty to disclose the omitted information. *See In re Time Warner, Inc. Securities Litigation,* 9 F.3d 259, 267 (2d Cir. 1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1397, 128 L.Ed.2d 70 (1994).

To determine whether the question of materiality and duty to disclose can be resolved in this case as a matter of law, I look to the information disseminated and possessed by Synergen and the individual defendants. At a minimum, the plaintiffs present evidence that on April 6, 1992, each of the individual defendants attended the PPRC meeting at which the Phase II results were discussed. LaBrecque, ¶ 10. The defendants were provided with data indicating that "[a]ge, Apache II score, ARDS, liver and renal dysfunction and distribution of gram-negative bacteremia all appeared as significant covariantes favoring the high dose group in the [Phase II] trial." These defendants then learned that when the results were adjusted for organ dysfunction imbalances, "the level of significance of the outcome by dose effect seen in the Phase II results [rose] to an unacceptable $p = 0.062$ from $p = 0.035$." The defendants further learned that when the data was adjusted for pathogen groupings (type of infection—i.e. gram-positive, gram-negative, etc.), the analysis was also unfavorable. A short time later, Catalano sent a letter documenting these concerns to Synergen's Board, including Saxe and Soll. Plaintiffs' exh. 28 at SYN35451.

Viewing this evidence in a light most favorable to the plaintiffs and drawing all reasonable inferences in their favor, I cannot conclude that the omissions are so obviously unimportant to reasonable investors in deciding whether to purchase Synergen stock that reasonable minds cannot differ on the question of materiality. *TSC Indus.,* 426 U.S. at 449, 96 S.Ct. at 2132. Accordingly, whether the information disclosed to all defendants on April 6, 1992 concerning the imbalances in the Phase II treatment groups, but not to the investing public, is a "material" omission is a jury question. Although the defendants submit Synergen's final integrated report to rebut the contention that these imbalances were in fact statistically significant, this evidence simply emphasizes the existence of genuine issues of fact precluding summary judgment.

In addition, having touted the Phase II results, the defendants may have had a duty to disclose known facts that would have placed the Phase II trial in a different light. As analyst Richard Stover of Stover Haley Noyes was credited as saying in *The Bernstein Report on Bio Business,* if people had known that the placebo group was sicker than the high-dose treatment group in Phase II, it would have cooled their enthusiasm. Plaintiffs' exh. 177. A genuine factual dispute exists whether these undisclosed facts render the defendants' original disclosures concerning the Phase II trial materially misleading and, as a result, gave rise to a duty to correct their previous statements. *See Time Warner,* 9 F.3d at 268 ("A duty to disclose arises whenever secret information renders prior public statements materially misleading, not merely when information completely negates the public statements.")

### D.

Synergen also reported in the advisory that the Phase II results showed survival was demonstrated to be a linear function of dose at the $p = 0.015$ level. In capitol letters, the advisory stated:

INTERLEUKIN–1 RECEPTOR ANTAGONIST (1l–1RA) REDUCES MORTALITY IN PATIENTS WITH SEPSIS SYNDROME.

It further reported: "We [Synergen] conclude IL–1ra [Antril] ... significantly reduces mortality in patients with sepsis syndrome." Notwithstanding these representations, the defendants contend that their reference to $p = 0.015$ refers to survival curves rather than 28–day mortality and that investors understood this representation. *See* Reply at 13–15.

Survival curves measure the number of days a patient lives during the 28–day trial.

Supplemental Declaration of Robert Makuch (Makuch II), ¶ 2. In contrast, "28–day mortality" or "mortality" refers to the percentage of patients who are dead on the 28th day of the trial. *Id.* The defendants admit that the p-value for mortality in the Phase II trial was p = 0.035 whereas the survival curve rate p-value was p = 0.015. Reply at 14. A Cowen & Co. report issued one day after the media advisory stated:

> Antril showed statistically significant trends toward reduction of all causes mortality in a dose dependent manner (p = 0.015, with a Wilcox Analysis)....

Defs' exh. 56. This report also included a chart illustrating the number of deaths in each arm, the percent of deaths in each arm, and percent reduction in deaths in each treatment arm compared to the placebo group. *Id.* Synergen submits the Cowen report as evidence that investors and analysts understood the p-value represented the survival curve, not mortality rate.

The plaintiffs submit the same report to prove investors did not understand that the p-value disseminated by the defendants represented the survival curve. In addition, the plaintiffs offer evidence of a Prudential Securities report issued on the same day which stated:

> One can see a very clear (p = 0.015) relationship between the amount of drug administered and the mortality and the mortality rate (lower mortality the higher the dose).

Defs' exh. 50. Also, in October, 1992, Dr. Opal, a Synergen consultant, in describing the Phase II results included a bar graph in a poster presentation which read: "28 Day All Cause Mortality Rate For the Entire Study Population." Plaintiffs' exh. 243 at SYN06828. The p-value set forth with the chart was p = 0.015. *Id.* Based on all the documents submitted, viewed in a light most favorable to the plaintiffs and drawing all reasonable inferences in their favor, a reasonable trier of fact could find that investors did not understand that p = 0.015 referred to survival curves, not the 28–day mortality rate.

**E.**

As an alternative basis for summary judgment, the defendants contend that they did not act with scienter. Scienter, also an element of a § 10(b) and Rule 10b–5 cause of action, *Farlow v. Peat, Marwick, Mitchell & Co,* 956 F.2d 982, 986 (10th Cir.1992), "refers to a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193, 96 S.Ct. 1375, 1381, 47 L.Ed.2d 668 (1976), *rehearing denied,* 425 U.S. 986, 96 S.Ct. 2194, 48 L.Ed.2d 811 (1976). Proof of scienter may be satisfied by a showing of recklessness, or conduct which falls far short of the standard of ordinary care and which carries a danger of misleading purchasers such that defendants knew or must have known of its propensity to mislead. *C.E. Carlson, Inc. v. SEC,* 859 F.2d 1429, 1435 (10th Cir.1988). Liability may not be imposed for simple negligent conduct. *Farlow,* 956 F.2d at 986.

Here, again, the plaintiffs respond to defendants' argument with specific facts showing the existence of a genuine issue to be tried. For example, on November 7, 1991, the day the advisory was issued, Synergen released two other press releases, one announcing a new public offering. Plaintiffs' exhs. 2, 38. In addition, three of the four individual defendants attempted to sell a substantial amount of their Synergen stock almost immediately after the advisory was issued. Then, in April, 1992 disclosures were made directly to the defendants concerning the Phase II results and imbalances in the treatment arms from which the defendants knew or must have known that their previous statements: "Antril *will* treat *all* patients with sepsis syndrome, *regardless of their underlying infection",* carried a danger of misleading investors because the Phase II results failed to support this statement. Notwithstanding the receipt of this information, defendants failed to correct the previous representation that the "baseline characteristics were similar".

In June, 1992, Synergen and its outside consultants prepared a draft manuscript for publication concerning the Phase II results. Originally, the draft concluded, "Il–1ra is safe and provides a dose-related survival ad-

vantage in patients with sepsis syndrome and septic shock regardless of the source or type of infecting organism." Plaintiffs' exh. 31 at SYN045972. Thompson pointed out to Catalano that the statement "regardless of the source or type of infecting organism ... doesn't seem to be valid any longer ..." Plaintiffs' exh. 32 at SYN045962. He further stated: "As far as I can see now, it's only proven from gram negative, not from gram positive, and so [the] statement [regardless of the type of effecting pathogens] should be eliminated." Id. at SYN045966. The phrase was altered and then eliminated in subsequent drafts. Plaintiffs' exh. 35 at OP01512; exh. 33 at SYN007891. By September, 1992, the manuscript for the Phase II trial stated its conclusion as: "Il–1ra is safe and provides a dose-related survival advantage in patients displaying signs of sepsis syndrome and septic shock." Several months later, the *New England Journal of Medicine* suggested that this manuscript be revised and noted that "[g]iven the size of this study, your conclusions should be more cautious". Plaintiffs' exh. 34 at SYN171700.

As evidence of defendants' knowledge that the Phase II trial had not proven Antril effective in treating both shock and non-shock patients, the plaintiffs submit the revised Phase III protocol submitted to the FDA on January 6, 1993. Plaintiffs' exh. 42. In it, Synergen states:

> An analysis of the data from the Phase II trial ... showed a strong dose-related reduction in mortality for the shock group and a nonsignificant result for the non-shock group (there were only 34 patients in the latter group). This result suggests an interaction between treatment and the presence or absence of shock.

*Id.* Opal's post-class period presentation further supports circumstantially the plaintiffs' scienter argument. Opal presented the Phase II and Phase III trial results at a medical symposium in Brussels, Belgium in March, 1993, disclosing the following about Phase II: a) there was "no apparent benefit in the non-shock patients" (Opal Tr. 204–06); b) "the dose-dependent survival advantage was most apparent in those patients who had gram-negative infections versus the gram-

positive infections" (Opal Tr. 206); c) "there were imbalances in patient characteristics in the four patient groups—none [of those imbalances] were statistically significant" (Declaration of Laura Bandrowsky (Bandrowsky), ¶ 9, Defs' ex. 52); and, 4) "[t]he results of beneficial effects [sic] is most apparent in patients who were the sickest." *Id.*

Based on all of the evidence, a jury could reasonably conclude that the defendants acted with scienter from the beginning of the class period, were reckless in failing to correct their previous statements after April 6, 1992, or acted fraudulently by continuing to assert Antril's effectiveness in treating "all patients with sepsis syndrome, regardless of their underlying infection" after the April 6, 1992 disclosures. Similarly, based only on the revised Phase III protocol and Opal's post-class period presentation, a reasonable jury could infer defendants knew before Phase III was completed and the class period ended that the Phase II trial results were, at best, inconclusive as to the treatment effect of Antril on non-shock patient, and that imbalances in patient characteristics existed in the Phase II treatment arms. Thus, I cannot conclude, as a matter of law, that defendants lacked the requisite scienter.

■ Next, while the defendants recognize that "motive" is not an element of a § 10(b) claim, they argue that the plaintiffs offer no motive for the alleged fraud. Because the plaintiffs need not prove the defendants' "motive" to sustain their claims in this case, I will not address this argument here.

### F.

Defendants next contend in this "fraud-on-the-market" securities case that the plaintiffs have failed to prove the market was not aware of the risks defendants allegedly concealed. As a threshold matter, the defendants' argument, which is essentially a "truth on the market" defense, places incorrectly the initial burden of proof on the plaintiffs. More importantly, a genuine issue of material fact exists on this question and, thus, summary judgment is inappropriate.

The fraud-on-the-market theory is based on the hypothesis that in a market for securi-

ties which is "information efficient" the price of the securities issued by a company is determined by the available material information regarding the company and its business. *Basic, Inc.*, 485 U.S. at 247, 108 S.Ct. at 992; *T.J. Raney & Sons, Inc. v. Fort Cobb, Okl. Irr. Fuel Authority*, 717 F.2d 1330, 1332 (10th Cir.1983), *cert. denied*, 465 U.S. 1026, 104 S.Ct. 1285, 79 L.Ed.2d 687 (1984). Because most publicly available information is reflected in market price, an investor's reliance on any public material misrepresentations may be presumed in a securities fraud case. *Basic, Inc.*, 485 U.S. at 247, 108 S.Ct. at 992. At its simplest, the theory requires only that a plaintiff prove purchase of a security and that a material misrepresentation was made concerning the security by the defendant which resulted in an artificial change in price. *T.J. Raney*, 717 F.2d at 1332.

Here, Synergen's stock price rose appreciably after the first allegedly misleading statement on November 7, 1991 and then plummeted after the phase III results were announced. Preston, ¶¶ 17 and 21. It is undisputed that plaintiffs purchased Synergen's securities during the class period. Therefore, the defendants bear the Rule 56 burden to rebut the presumption.

The *Basic* Court acknowledged that the fraud on the market presumption could be rebutted by "[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price." *Basic Inc.*, 485 U.S. at 248, 108 S.Ct. at 992. For example, "if, despite [the defendants'] allegedly fraudulent attempt to manipulate the market price, news ... credibly entered the market and dissipated the effects of the misstatements [or omissions], those who traded ... would have no direct or indirect connection with the fraud." *Basic Inc.*, 485 U.S. at 248–49, 108 S.Ct. at 992; *Steiner v. Tektronix, Inc.*, 817 F.Supp. 867, 880 (D.Or.1992) (The defendants' failure to disclose material information may be excused if that information has been made credibly available to the market by other sources.) Misleading statements may also be excused if correct information has credibly

entered the market. *In re Apple Computer Securities Litigation*, 886 F.2d 1109, 1115 (9th Cir.1989), *cert. denied*, 496 U.S. 943, 110 S.Ct. 3229, 110 L.Ed.2d 676 (1990). However, the truth on the market defense has its limits. *Seagate*, 802 F.Supp. 271, 275 (N.D.Ca.1992). Scrutiny by the press or analysts will not ordinarily excuse misleading statements or omissions, and corporations are not relieved of their duty to disclose material information where that information has received inadequate exposure from third party sources. *Id.*

Although there are no cases in this circuit addressing the "truth on the market" defense suggested by the *Basic* Court, even assuming its application here, summary judgment will not lie. While the defendants submit guarded analysts' and news reports including, among others, Merrill Lynch, Prudential Securities, Smith Barney, Robertson Stephens & Company, and Investors Business Daily, the plaintiffs offer contradictory evidence to prove that the truth about the Phase II results and the alleged omissions did not credibly enter the market. *See, e.g.,* Plaintiffs' exhs. 103, 105, 110, 122, 136, 138, 139, 151 and 153. Because a genuine dispute exists concerning market knowledge, I cannot conclude, as a matter of law, that the presumption of reliance has been rebutted.

## V.

Turning to individual defendant liability, in Count I of the complaint, the plaintiffs allege that all of the defendants violated § 10b and Rule 10b–5. In count II, the individual defendants are alleged to be liable for violations under § 20(a) as "control persons". With the exception of Saxe, the individual defendants contend that the plaintiffs cannot prove they are primarily liable (count I) and all of the individual defendants contend they are not secondarily liable (count II).

Soll, Collins, and Catalano contend they cannot be held primarily responsible because they made no statements which are alleged to be false. A reasonable jury could conclude otherwise.

Soll signed the 1992 Report, and gave investor presentations concerning Antril on

more than one occasion. Collins made a presentation at the Hannefin Imhoff winter conference which generally followed the road show script. Similarly, Catalano, made road show presentations on more than one occasion. The script for these shows stated "the attractiveness of Antril in this severe, life threatening conditions that it *will* treat *all* patients with sepsis syndrome, *regardless of whether or not their underlying infection is gram negative, or gram positive*". At other shows, the script read: "The attractiveness of Antril in this life threatening condition is that it *will* treat *all* patients with sepsis syndrome, *regardless of their underlying infection*". Moreover, in making these presentations, a reasonable jury could find the individual defendants failed to state a material fact i.e. the Phase II treatment arms were not similar. In addition, Catalano was listed as a co-author of the abstract presented on November 7, 1991 which states in relevant part: "Baseline characteristics were similar among treatment groups. Survival was demonstrated to be a linear function of dose at the p = 0.015 level." Defendants' exh. 5. Accordingly, I cannot conclude, as a matter of law, that none of the allegedly false or misleading statements or omissions are primarily attributable to Soll, Collins, and Catalano.

To impose § 20(a) secondary liability in a securities fraud case, a plaintiff must prove a primary violation and that defendant is a controlling person. *First Interstate Bank of Denver, N.A. v. Pring*, 969 F.2d 891, 896–898 (10th Cir.1992), *rev'd on other grounds*, —— U.S. ——, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994). In addressing the definition of controlling person under § 20(a), the Tenth Circuit court recognizes that "the statute is remedial and is to be construed liberally." *Id.* (quoting *Richardson v. MacArthur*, 451 F.2d 35, 41 (10th Cir.1971)). One can be a controlling person despite exercising only indirect control. *Id.* Once a plaintiff proves his prima facie case, the defendant then has the burden to show that he acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action. *Id.*

Here, the individual defendants do not dispute that they are "controlling persons". Instead, they present evidence they acted in good faith. This evidence is, however, contradicted by plaintiffs' evidence. In particular, a reasonable jury could infer from the evidence that the individual defendants knew or must have known by April 6, 1992 that the Phase II trial did not prove Antril effective in treating "*all* patients with sepsis syndrome, *regardless of their underlying infection.*" The information imparted to the individual defendants on this date showed that imbalances between the arms favored the high-dose group and Antril had not proven effective for patients with gram-positive infections, with fungal infections, or with any kind of infection other than gram-negative infections. In addition, the subsequent letter from Catalano to the Board is further circumstantial evidence of Saxe's and Soll's lack of good faith. Furthermore, the individual defendants' failure to correct statements concerning Antril's effectiveness as revealed in the Phase II trial and their failure to correct their previous statements concerning the similarity of baseline characteristics is sufficient to create a factual dispute as to their alleged good faith. Accordingly, this issue must also be resolved by a jury.

## VI.

In addition to all of the above alleged misrepresentations and omissions, the plaintiffs contend that the defendants misrepresented the results from the animal studies and the potential market for Antril. Because I am denying the defendants' summary judgment motion on other grounds, I need not address in detail these additional arguments. I will, however, note that like the other alleged misrepresentations and omissions, factual questions exist as to whether these statements were misleading.

ACCORDINGLY, IT IS ORDERED that:

1) The defendants' motion for summary judgment IS DENIED.